

**Lynda A. Bennett**
Partner
Chair, Insurance Recovery
Practice

1251 Avenue of the Americas
New York, New York 10020

T: (973) 597-6338
M: (908) 693-1704
E: lbennett@lowenstein.com

October 1, 2024

**VIA ECF**

The Honorable Richard M. Gergel, U.S.D.J.
United States District Court for the
District of South Carolina
J. Waites Waring Judicial Center
83 Meeting Street
Charleston, South Carolina  29401

Re:    ***BASF Corporation v. AIU Insurance Company*, No. 2:24-cv-00993-RMG; and**

   ***Certain Underwriters at Lloyd's London v. BASF Corporation*, No. 1:24-cv-01684**

Dear Judge Gergel:

This firm represents BASF Corporation ("BASF"), as successor in interest to Ciba Corporation, in the litigation pertaining to BASF's insurance coverage pending before this Court.  I write in furtherance of the August 12, 2024 letter BASF submitted to this Court, (ECF No. 128), requesting that Your Honor schedule a case management conference to discuss: (i) setting deadlines for the parties to complete the tasks required under Your Honor's Conference and Scheduling Order; and (ii) arranging to coordinate all pretrial proceedings in the action captioned *BASF Corporation v. AIU Insurance Company*, No. 2:24-cv-00993-RMG (the "First Filed Action") and the action captioned *Certain Underwriters at Lloyd's London v. BASF Corporation*, No. 2:24-cv-4325 (the "London Action," together with the First Filed Action, the "Actions"), transferred to this Court by the Judicial Panel on Multidistrict Litigation ("JPML").

Since BASF last wrote to Your Honor, there have been new developments in a third related state court coverage proceeding in New Jersey (the "New Jersey Action") relevant to both the Actions and BASF's requested relief.  In sum, the New Jersey Action has been temporarily stayed until January 2025 pending further developments on BASF's coverage claims in the Actions prior to the next status conference in the New Jersey Action.  Based on the insurers' representations during the hearing that resulted in that stay, they, like BASF, are interested in moving forward with discovery on BASF's coverage claims.  Accordingly, as BASF previously respectfully requested from this Court, a pretrial schedule should be set and the First Filed Action should be coordinated with the London Action so that BASF may move forward with discovery in the forum the JPML has ruled will provide the most efficient means for conducting that discovery.

---

NEW YORK    PALO ALTO    NEW JERSEY    UTAH    WASHINGTON, D.C.             Lowenstein Sandler LLP

Honorable Richard M. Gergel                                          October 1, 2024
Page 2

By way of brief background, the New Jersey Action involves all of BASF insurers that are parties to the First Filed Action and the transferred London Action, and concerns the same claims seeking insurance coverage for AFFF Lawsuits. BASF filed the New Jersey Action in response to the London Action (which was originally venued in New York) to preserve its rights, as the insured should be permitted to select a forum of its choosing to resolve coverage disputes. (Ex. A ¶¶ 64-68.) BASF has, however, always maintained that the District of South Carolina is the appropriate forum for coverage claims, and that is why BASF filed the First Filed Action before Your Honor and obtained transfer of the London Action to the AFFF MDL.

While the JPML was considering whether the London Action would benefit from consolidation with the AFFF MDL this Court is handling, BASF and certain insurers agreed to stay the New Jersey Action. No insurers challenged the stay while the JPML's decision was pending. (Ex. B at 28:9-32:10.) Yet, after the London Action was transferred to this Court, the insurers' tenor changed. BASF sought the consent of all insurers to extend the stay in the New Jersey Action to allow Your Honor to adjudicate the Actions. The insurers rejected that request, thereby seeking to create piecemeal litigation and threatening the prospect of inconsistent rulings on BASF's coverage claims that the JPML sought to avoid by transferring the London Action to the AFFF MDL. As a result, BASF was forced to move to extend the stay in the New Jersey Action. The insurers opposed that motion.

On September 20, 2024, the Hon. Gary Wolinetz, J.S.C. held a hearing on BASF's motion to extend the stay in the New Jersey Action. (Ex. B.) During that hearing, Judge Wolinetz questioned the insurers as to why they resisted staying the New Jersey Action. In response, the insurers stated that while they believed they could receive a "fair shake" before this Court and "don't have an issue with Judge Gergel handling the litigation," they are concerned about becoming "one of thousands of cases that Judge Gergel was handling on these firefighting foam cases." (*Id.* at 21:6-23; 23:16-22; 24:2-3.) In essence, the insurers sought to move the New Jersey Action forward instead of staying it because in the First Filed Action and the London Action "there may be some procedural maneuvering that would take a long time, and that would prejudice us in the sense of, we cannot get started on any kind of discovery while these procedural maneuverings are taking place" and the insurers "don't want to be part of a massive . . . proceeding," (*id.* at 22:19-23, 23:17-22, 24:2-3, 50:12-13)—notwithstanding that: (i) the insurers are the ones who erected the artificial procedural hurdles; and (ii) the JPML already has considered, and rejected, these concerns when it ruled that the most efficient way to handle BASF's coverage claims is to consolidate them before this Court. Thus, despite Judge Wolinetz's repeated questioning, the only potential "prejudice" the insurers identified during the hearing was that they wanted to take discovery but a stay would prevent them from doing so (even though the insurers have resisted proceeding with discovery in the Actions currently pending before Your Honor). (*Id.* 33:14-21, 50:12-15.)

Ultimately, Judge Wolinetz entered an Order extending the stay in the New Jersey Action through January 10, 2025, and directed the parties to report back to him on the status of the Actions. (Ex. C.) At that time, Judge Wolinetz will further consider how the New Jersey Action will proceed, if at all. (Ex. C.) Judge Wolinetz reached this decision because, while he recognized that the



Honorable Richard M. Gergel                                    October 1, 2024
Page 3

JPML entered "a very strong order regarding . . . centralizing these disputes and . . . cases"[1] before this Court and that it would be a "recipe for disaster" for him "to be involved in a situation where I'm issuing rulings that contradict whatever is going on in South Carolina," (*id.* at 45:5-10, 46:20), he wanted to avoid "a situation where they [the insurers] want to litigate this case . . . and it's sitting around because Judge Gergel is . . . buried under a million cases, and nothing gets done." (*Id.* at 53:7-13, 56:9-17, 58:9-13.)  At the same time, however, Judge Wolinetz recognized that "if there is a judge who is . . . well versed in handling all of these cases [AFFF cases], and no one is going to be prejudiced, why . . . wouldn't I allow that judge to deal with this case, at least temporarily."  (*Id.* at 30:21-25.)

                                *        *        *

Accordingly, BASF respectfully renews its request for a case management conference before this Court to set a schedule for discovery and other pretrial matters, consistent with the insurers' representations that they are interested in moving on with discovery on BASF's coverage claims.

Respectfully submitted,

*Lynda Bennett*

Lynda A. Bennett (*admitted pro hac vice*)

David C. Kimball (Fed. ID No. 10475)

Enclosure(s)

cc:     Counsel of Record *(via ECF)*

---

[1]    Tellingly, the insurers entirely ignored the existence of the JPML Transfer Order when they opposed BASF's motion to extend the stay in the New Jersey Action, but Judge Wolinetz properly considered it.  (Ex. B at 37:10-20.)



# EXHIBIT A

Lynda A. Bennett (Bar No. 010251995)
Eric Jesse (Bar No. 019372009)
Heather Weaver (Bar No. 023492011)
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
973.597.2500

*Attorneys for Plaintiff BASF Corporation*

| | |
|---|---|
| BASF CORPORATION, as successor in interest to CIBA CORPORATION, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY |
| Plaintiff, | |
| vs. | DOCKET NO.: _____ |
| ACE AMERICAN INSURANCE COMPANY, AIU INSURANCE COMPANY, ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, ALLIANZ VERSICHERUNGS-AG, ALLSTATE INSURANCE COMPANY, AXA GROUP AG, AXA INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, CERTAIN LONDON MARKET INSURANCE COMPANIES, EMPLOYERS MUTUAL CASUALTY COMPANY, EVEREST REINSURANCE COMPANY, FEDERAL INSURANCE COMPANY, FIRST STATE INSURANCE COMPANY, GRANITE STATE INSURANCE COMPANY, HDI GLOBAL INSURANCE COMPANY, HDI GLOBAL SE, INSURANCE COMPANY OF NORTH AMERICA, INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, INTERSTATE FIRE & CASUALTY COMPANY, LEXINGTON INSURANCE COMPANY, MUNICH REINSURANCE AMERICA, INC., NATIONAL CASUALTY COMPANY, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, NEW ENGLAND INSURANCE COMPANY, NEW ENGLAND REINSURANCE CORPORATION, RSA INSURANCE GROUP LIMITED, TIG | Civil Action

**COMPLAINT & JURY DEMAND** |

INSURANCE COMPANY, TRAVELERS
CASUALTY & SURETY COMPANY, TWIN
CITY FIRE INSURANCE COMPANY,
WESTPORT INSURANCE CORPORATION,
ZURICH INSURANCE GROUP LIMITED,
SAFETY NATIONAL CASUALTY
CORPORATION, MIDSTATES
REINSURANCE CORPORATION,
EUROPEAN REINSURANCE COMPANY OF
ZURICH, GREENWICH INSURANCE
COMPANY, SWISS REINSURANCE
COMPANY, and PACIFIC INSURANCE
COMPANY,

Defendants.

Plaintiff BASF Corporation ("BASF" or "Ciba"), by and through its attorneys, Lowenstein

Sandler LLP, by way of Complaint against the defendant insurance companies identified below

(collectively the "Defendant Insurers"), alleges as follows:

## NATURE OF THE ACTION

1.      This is an insurance coverage action for breach of contract and declaratory relief.

This action arises under umbrella and excess liability insurance policies issued by the Defendant

Insurers that provide coverage to BASF, as successor-in-interest to Ciba Corporation ("Ciba

Corp."), for certain alleged liabilities arising from claims and legal causes of action in lawsuits

around the country.

2.      Specifically, Ciba Corp. and/or its predecessor manufactured the surfactant

Lodyne, which was used, *inter alia*, in connection with the manufacture of certain Aqueous Film-

Forming Foams ("AFFF").

3.      BASF, as successor-in-interest to Ciba Corp., has been named as a defendant in

thousands of underlying lawsuits, which are brought by individual claimants, including current

and former military and civilian firefighters, public, quasi-public and private water providers, state

and municipal governmental authorities, and others, that allegedly have suffered bodily injury, property damage or personal injury, or some combination thereof, which they claim resulted from exposure to, *inter alia*, Lodyne manufactured, designed, sold, supplied or distributed by Ciba Corp. (or its predecessor) and used in AFFF (the "AFFF Lawsuits"). These AFFF Lawsuits seek to hold BASF legally responsible for damages allegedly sustained by the underlying plaintiffs. The AFFF Lawsuits have been filed in courts nationwide, including AFFF Lawsuits filed by more than 90 plaintiffs who are residents of New Jersey. Those lawsuits filed by New Jersey residents have been filed in New Jersey state court, New Jersey federal court (and transferred to the MDL (defined herein)), or directly filed in the MDL.

4.      By and through this action, BASF seeks insurance coverage for the AFFF Lawsuits.

5.      The Defendant Insurers' insurance policies, which insure BASF as the successor-in-interest to Ciba Corp., consist of umbrella and excess general liability insurance policies that provide coverage for alleged bodily and/or personal injury or property damage that took place during policy periods from 1976 to 1986.[1] Specifically, those insurance policies require the Defendant Insurers to pay all sums, including the payment of defense litigation fees and expenses, for which their insured shall become legally obligated to pay which arise out of an occurrence (the "Policies").

6.      The AFFF Lawsuits allege an occurrence that is covered by the Policies, and the AFFF Lawsuits seek damages for bodily injury, property damage, or personal injury, as those terms are used in the Policies. The AFFF Lawsuits further allege that bodily injury, property

---

[1] Defendant Ace American Insurance Company issued a claims-made policy, no. G23733298, with a policy period of December 31, 2007 to December 31, 2008 (the "Ace Policy"). Certain AFFF Lawsuits were made, or are deemed made, during this policy's policy period and the alleged bodily and/or personal injury or property damage occurred during the relevant time periods under the Ace Policy.

damage, or personal injury occurred during the policy periods of the Policies (or, with respect to the Ace Policy, during the relevant time period).

7.      Accordingly, the Defendant Insurers are obligated to pay the litigation costs and expenses that BASF has incurred, and will continue to incur, in connection with the AFFF Lawsuits.  All Defendant Insurers also have an obligation to acknowledge coverage and, up to the full amount of their respective insurance policy limits, to indemnify BASF for all sums incurred to satisfy any legal liability incurred in connection with the AFFF Lawsuits, including any judgment or settlement entered in those matters.

8.      BASF has satisfied all terms and conditions of the Policies.  Thus, BASF is entitled to the full benefit of the insurance coverage available under the Policies for the AFFF Lawsuits.

9.      This case involves an actual, justiciable controversy between and among BASF and the Defendant Insurers because the Defendant Insurers have failed and refused to acknowledge their obligation to provide insurance coverage for the AFFF Lawsuits as required by the Policies.

## THE PARTIES

### *Plaintiff*

10.     BASF is a corporation organized and existing under the laws of the state of Delaware, with its headquarters and principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932.

11.     The Policies were issued to Ciba-Geigy Corporation (among others), and BASF, as the legal successor to Ciba Corp., is an insured under the Policies and, in turn, is the real party in interest in connection with the insurance claims being made under the Policies based on the following corporate history:   In 1996, Ciba-Geigy Corporation ("Ciba-Geigy") spun off its specialty chemicals business, which included the Lodyne product line, into a new entity called

Ciba Specialty Chemicals Corporation ("Ciba Specialty"), which remained an insured under the Policies.  In 2007, Ciba Specialty changed its name to Ciba Corporation and, in 2009, BASF acquired Ciba Corporation.  Ciba Corporation was later converted to BASF Performance Products LLC and then merged into BASF Corporation.  Pursuant to the agreements concerning the separation of Ciba-Geigy Corporation's historic business lines, BASF has the right to make claims under the Policies.

### *Defendant Insurers*

12.     **Ace**. Defendant Ace American Insurance Company ("Ace") is a corporation organized under the laws of the state of Pennsylvania, with its principal place of business located in the state of Pennsylvania.  Upon information and belief, at all relevant times, Ace was and is licensed to do and is doing business in the state of New Jersey.  Ace, along with certain other insurers as identified herein, is also referred to as "Chubb" and is part of the Chubb family of insurers.

13.     **AIU**.  Defendant AIU Insurance Company ("AIU") is a corporation organized under the laws of the state of New York, with its principal place of business located in the state of New York.  Upon information and belief, at all relevant times, AIU was and is licensed to do and is doing business in the state of New Jersey.  AIU, along with certain other insurers as identified herein, is also referred to as "AIG" and is part of the AIG family of insurers.

14.     **Allianz Global**.  Upon information and belief, Defendant Allianz Global Risks US Insurance Company ("Allianz Global") is a corporation organized under the laws of the state of Illinois, with its principal place of business located in the state of Illinois.  Upon information and belief, at all relevant times, Allianz Global was and is licensed to do and is doing business in the state of New Jersey.  Allianz Global is the successor-in-interest to those Policies issued by

Fireman's Fund Insurance Company.  Allianz Global, along with certain other insurers as identified herein, is also referred to as "Allianz" and is part of the Allianz family of insurers.

15.   **Allianz AG**.  Upon information and belief, Defendant Allianz Versicherungs-AG ("Allianz AG") is a corporation organized under the laws of Germany, with its principal place of business located in Munich, Germany.  Allianz AG is the same entity as, or successor-in-interest to those Policies issued by, Allianz Versicherungs-Aktiengesellschaft.  Allianz AG, along with certain other insurers as identified herein, is also referred to as "Allianz" and is part of the Allianz family of insurers.

16.   **Allstate**.  Defendant Allstate Insurance Company ("Allstate") is a corporation organized under the laws of the state of Illinois, with its principal place of business located in the state of Illinois.  Upon information and belief, at all relevant times, Allstate was and is licensed to do and is doing business in the state of New Jersey.  Allstate is the successor-in-interest to those Policies issued by Northbrook Insurance Company.

17.   **AXA AG**.  Upon information and belief, Defendant AXA Group AG ("AXA AG") is a corporation organized under the laws of Germany, with its principal place of business located in Cologne, Germany.  AXA AG is the successor-in-interest to those Policies issued by Colonia Versicherung Aktiengesellschaft.  AXA AG, along with certain other insurers as identified herein, is also referred to as "AXA" and is part of the AXA family of insurers.

18.   **AXA Company**.  Defendant AXA Insurance Company ("AXA Company") is a corporation organized under the laws of the state of New York, with its principal place of business located in the state of New York.  Upon information and belief, at all relevant times, AXA Company was and is licensed to do and is doing business in the state of New Jersey.  AXA Company is the successor-in-interest to those Policies issued by Colonia Insurance Company.

AXA Company, along with certain other insurers as identified herein, is also referred to as "AXA" and is part of the AXA family of insurers.

19.    **Underwriters at Lloyd's**.  Defendants Certain Underwriters at Lloyd's, London ("Underwriters at Lloyd's") are members of insurance syndicates that have historically engaged in insurance underwriting through the Llyod's insurance market in London, England.  The Underwriters at Lloyd's are natural persons or entities who are or were members of the following underwriting syndicates at Lloyd's, London, that subscribed to one or more of the insurance policies issued to Ciba Corp. or BASF for the policy periods from April 1, 1976, to April 1, 1986: Syndicate 190, Syndicate 199, Syndicate 278, Syndicate 365, Syndicate 417, Syndicate 618, Syndicate 772, Syndicate 918.  Upon information and belief, at all relevant times, the Underwriters at Lloyd's were and are licensed to do and/or are doing business in the state of New Jersey.

20.    **London Market Companies**.  Defendant Certain London Market Insurance Companies ("London Market Companies") are all foreign corporations that historically placed insurance in the London insurance market.  Specifically, the London Market Companies are Catalina Worthing Insurance Ltd. F/K/A HFPI (as Part VII Transferee of Excess Insurance Company Ltd.) and/or London & Edinburgh Insurance Company (as Successor to London & Edinburgh General Insurance Company Ltd.) ("Catalina Worthing"); Cavello Bay Reinsurance Limited as successor by merger to Harper Insurance Limited (formerly known as Turegum Insurance Company) and as successor in interest to the rights and liabilities of Brittany Insurance Company Limited ("Cavello Bay"); Darag Deutschland AG, formerly known as Darag Deutsche Versicherungs-Und Rückversicherungs-AG, as successor in interest to AG Insurance SA/NV, formerly known as AG De 1830 Compagnie Belge; INSCO Ltd. in its own capacity and as successor to Britamco Ltd. and INSCO Insurance Company ("INSCO"); River Thames Insurance

-7-

Company Limited in its own right and as successor in interest to Unionamerica Insurance Company Limited (which in turn is statutory successor in interest to certain business of St. Paul Travelers Insurance Company Limited, formerly known as St. Katherine Insurance Company Limited and St. Katherine Insurance Company PLC) ("River Thames"); and Tenecom Limited (formerly known as Yasuda Fire & Marine Insurance Company (U.K.) Ltd and as successor to Winterthur Swiss Insurance Company formerly known as Accident & Casualty Insurance Company Of Winterthur) ("Tenecom").  Upon information and belief, at all relevant times, the London Market Companies were and are licensed to do and/or are doing business in the state of New Jersey.

21.    **Employers**.  Defendant Employers Mutual Casualty Company ("Employers") is a corporation organized under the laws of the state of Iowa, with its principal place of business located in the state of Iowa.  Upon information and belief, at all relevant times, Employers was and is licensed to do and is doing business in the state of New Jersey.

22.    **Everest**.  Defendant Everest Reinsurance Company (f/k/a Prudential Reinsurance Company) ("Everest") is a corporation organized under the laws of the state of Delaware, with its principal place of business in the state of New Jersey.  Everest was and is licensed to do and is doing business in the state of New Jersey.

23.    **Federal**.  Defendant Federal Insurance Company ("Federal") is a corporation organized under the laws of the state of Indiana, with its principal place of business in the state of New Jersey.  Federal was and is licensed to do and is doing business in the state of New Jersey. Federal is also the successor-in-interest to those Policies issued by Chubb & Son Insurance Company.  Federal, along with certain other insurers as identified herein, is also referred to as "Chubb" and is part of the Chubb family of insurers.

24.     **First State**.   Defendant First State Insurance Company ("First State") is a corporation organized under the laws of the state of Connecticut, with its principal place of business located in the state of Connecticut.  Upon information and belief, at all relevant times, First State was and is licensed to do and is doing business in the state of New Jersey.

25.     **Granite**.  Defendant Granite State Insurance Company ("Granite") is a corporation organized under the laws of the state of New York, with its principal place of business located in the state of Illinois.  Upon information and belief, at all relevant times, Granite was and is licensed to do and is doing business in the state of New Jersey.  Granite, along with certain other insurers as identified herein, is also referred to as "AIG" and is part of the AIG family of insurers.

26.     **HDI Company**.   Upon information and belief, Defendant HDI Global Insurance Company ("HDI Company") is a corporation organized under the laws of Illinois, with its principal place of business located in Hannover, Germany.   Upon information and belief, at all relevant times, HDI Company was and is licensed to do and is doing business in the state of New Jersey. HDI Company is the successor-in-interest to those Policies issued by Haftpflichtverband Der Deutschen Industrie V.a.G.  HDI Company, along with certain other insurers as identified herein, is also referred to as "HDI" and is part of the HDI family of insurers.

27.     **HDI SE**.  Upon information and belief, Defendant HDI Global SE ("HDI SE") is a corporation organized under the laws of Germany, with its principal place of business located in Hannover, Germany.   Upon information and belief, at all relevant times, HDI SE was and is licensed to do and is doing business in the state of New Jersey.  HDI SE is the successor-in-interest to those Policies issued by Gerling-Konzern Allgemeine Versicherungs-Aktiengesellschaft.  HDI SE, along with certain other insurers as identified herein, is also referred to as "HDI" and is part of the HDI family of insurers.

28. **INA**. Defendant Insurance Company of North America ("INA") is a corporation organized under the laws of the state of Pennsylvania, with its principal place of business located in the state of Pennsylvania. Upon information and belief, at all relevant times, INA was and is licensed to do and is doing business in the state of New Jersey. INA is also the successor-in-interest to those Policies issued by Central National Insurance Company of Omaha. INA, along with certain other insurers as identified herein, is also referred to as "Chubb" and is part of the Chubb family of insurers.

29. **ICOSP**. Defendant Insurance Company of the State of Pennsylvania ("ICOSP") is a corporation organized under the laws of the state of Illinois, with its principal place of business located in the state of New York. Upon information and belief, at all relevant times, ICOSP was and is licensed to do and is doing business in the state of New Jersey. ICOSP, along with certain other insurers as identified herein, is also referred to as "AIG" and is part of the AIG family of insurers.

30. **Interstate**. Defendant Interstate Fire & Casualty Company ("Interstate") is a corporation organized under the laws of the state of Illinois, with its principal place of business located in the state of Illinois. Upon information and belief, at all relevant times, Interstate was and is licensed to do and is doing business in the state of New Jersey. Interstate, along with certain other insurers as identified herein, is also referred to as "Allianz" and is part of the Allianz family of insurers.

31. **Lexington**. Defendant Lexington Insurance Company ("Lexington") is a Delaware corporation with its principal place of business in Massachusetts. Upon information and belief, at all relevant times, Lexington was and is licensed to do and is doing business in the state of New

Jersey.  Lexington, along with certain other insurers as identified herein, is also referred to as "AIG" and is part of the AIG family of insurers.

32.    **Munich**.  Defendant Munich Reinsurance America, Inc. (f/k/a American Re-Insurance Company) is a corporation organized under the laws of the state of Delaware, with its principal place of business located in the state of New Jersey.  Upon information and belief, at all relevant times, National Union was and is licensed to do and is doing business in the state of New Jersey.

33.    **National Casualty**.  Defendant National Casualty Company ("National Casualty") is a corporation organized under the laws of the state of Ohio, with its principal place of business located in the state of Ohio.  Upon information and belief, at all relevant times, National Union was and is licensed to do and is doing business in the state of New Jersey.

34.    **National Union**.   Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union") is a corporation organized under the laws of the state of Pennsylvania, with its principal place of business located in the state of New York.  Upon information and belief, at all relevant times, National Union was and is licensed to do and is doing business in the state of New Jersey.  National Union, along with certain other insurers as identified herein, is also referred to as "AIG" and is part of the AIG family of insurers.

35.    **New England**.  Defendant New England Insurance Company ("New England") is a corporation organized under the laws of the state of Connecticut, with its principal place of business located in the state of Massachusetts.  Upon information and belief, at all relevant times, New England was and is licensed to do and is doing business in the state of New Jersey.

36.    **New England Re**.  Defendant New England Reinsurance Corporation ("New England Re") is a corporation organized under the laws of the state of Connecticut, with its

principal place of business located in the state of Massachusetts.  Upon information and belief, at all relevant times, New England Re was and is licensed to do and is doing business in the state of New Jersey.

37.  **RSA**.  Defendant RSA Insurance Group Limited ("RSA") is a corporation organized under the laws of England and Wales, with its principal place of business located in London, England.  RSA is the successor-in-interest to those Policies issued by Royal Insurance.

38.  **TIG**.  Defendant TIG Insurance Company ("TIG") is a corporation organized under the laws of the state of New Hampshire, with its principal place of business located in the state of California.  Upon information and belief, at all relevant times, TIG was and is licensed to do and is doing business in the state of New Jersey.  TIG is the successor-in-interest to those Policies issued by Gibraltar Insurance Company.

39.  **Travelers**.  Defendant Travelers Casualty & Surety Company ("Travelers") is a corporation organized under the laws of the state of Connecticut, with its principal place of business located in the state of Connecticut.  Upon information and belief, at all relevant times, Travelers was and is licensed to do and is doing business in the state of New Jersey.  Travelers is the successor-in-interest to those Policies issued by Aetna Casualty & Surety Company.

40.  **Twin City**.  Defendant Twin City Fire Insurance Company ("Twin City") is a corporation organized under the laws of the state of Indiana, with its principal place of business located in the state of Connecticut.  Upon information and belief, at all relevant times, Twin City was and is licensed to do and is doing business in the state of New Jersey.

41.  **Westport**.  Defendant Westport Insurance Corporation ("Westport") is a corporation organized under the laws of the state of Missouri, with its principal place of business located in the state of Missouri.  Upon information and belief, at all relevant times, Westport was

and is licensed to do and is doing business in the state of New Jersey.  Westport is the successor-in-interest to those Policies issued by Manhattan Fire & Marine, and Puritan Insurance Company.

42.     **Zurich**.  Defendant Zurich Insurance Group LTD. ("Zurich") is a corporation organized under the laws of Switzerland, with its principal place of business located in Zurich, Switzerland.  Zurich is the successor-in-interest to those Policies issued by Zurich International Ltd. and/or Zurich Insurance Company.

43.     **Safety**.  Defendant Safety National Casualty Corporation ("Safety") is a corporation organized under the laws of Missouri, with its principal place of business located in Missouri.  Safety is the successor-in-interest to those Policies issued by Safety Mutual Casualty Corporation.

44.     **Midstates**.  Defendant Midstates Reinsurance Corporation ("Midstates") is a corporation organized under the laws of the state of Illinois, with its principal place of business located in the state of Ohio.  Upon information and belief, at all relevant times, Midstates was and is licensed to do and is doing business in the state of New Jersey.  Midstates is the successor-in-interest to those Policies issued by Mead Reinsurance Corporation.

45.     **European Re**.  Defendant European Reinsurance Company of Zurich ("European Re") is a corporation organized under the laws of Switzerland, with its principal place of business located in Switzerland.  European Re is the successor-in-interest to those Policies issued by European General Reinsurance Company of Zurich.

46.     **Greenwich**.  Defendant Greenwich Insurance Company ("Greenwich") is a corporation organized under the laws of the state of Delaware, with its principal place of business located in the state of Connecticut.  Upon information and belief, at all relevant times, Greenwich was and is licensed to do and is doing business in the state of New Jersey.  Greenwich is the

successor-in-interest to those Policies issued by Harbor Insurance Company.  Greenwich, along with certain other insurers as identified herein, is also referred to as "AXA" and is part of the AXA family of insurers.

47.     **Swiss Re.**  Defendant Swiss Reinsurance Company ("<u>Swiss Re</u>") is a corporation organized under the laws of Switzerland, with its principal place of business located in Switzerland.  Upon information and belief, at all relevant times, Swiss Re was and is licensed to do and is or was doing business in the state of New Jersey.

48.     **Pacific.**   Defendant Pacific Insurance Company ("<u>Pacific</u>") is a corporation organized under the laws of the state of Connecticut, with its principal place of business located in the state of Connecticut.  Upon information and belief, at all relevant times, Pacific was and is licensed to do and is doing business in the state of New Jersey.

## <u>JURISDICTION AND VENUE</u>

49.     This Court has jurisdiction over each Defendant Insurer because, upon information and belief, each Defendant Insurer: (i) is licensed to do business in New Jersey; (ii) has engaged, and continues to engage, in substantial business activities in this State, including but not limited to selling insurance to policyholders in this State; (iii) has insured, and continues to insure, risks located in this State, *inter alia*, through the issuance of the Policies for the benefit of BASF; (iv) included New Jersey within the coverage territory of each of the Policies at issue, thereby insuring New Jersey risks relating to Ciba Corp.'s operations, products, and interests in or relating to New Jersey; (v) through their Policies, promised to provide insurance coverage for legal liabilities that may be imposed on a nationwide basis in connection with products that would be, and were, sold on a nationwide basis, including in New Jersey; and/or (vi) did not include any territorial limit within the Policies that would preclude BASF from pursuing coverage from the Defendant Insurers

for all sums that it must incur to defend and resolve the AFFF Lawsuits currently pending across the country. In addition, at least 90 AFFF Lawsuits were filed by New Jersey residents in New Jersey state court, New Jersey federal court (and transferred to the MDL), or directly in the MDL.

50.     The Policies issued, or subscribed to, by Defendants Underwriters at Lloyd's and London Market Companies contain or incorporate a "Service of Suit Clause" stating that:

> It is agreed that in the event of the failure of Underwriters [i.e., Defendants Underwriters at Lloyd's and London Market Companies] hereon to pay any amount claimed to be due hereunder, Underwriters hereon, at the request of the Assured [i.e., BASF], will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

Based on this Service of Suit Clause, this Court has jurisdiction over Defendants Underwriters at Lloyd's and London Market Companies.

51.     Venue is proper in this Court because BASF, which owns a laboratory facility in Iselin, New Jersey and leases a warehouse in Edison, New Jersey, is actually doing business in Middlesex County. In addition, at least some of the Defendant Insurers are actually doing business in Middlesex County.

52.     Because the amount in controversy exceeds $200,000, BASF designates this case for the complex business litigation program.

## FACTUAL BACKGROUND

### *The AFFF Lawsuits*

53.     BASF has been named as a defendant in thousands of AFFF Lawsuits which allege bodily injury, personal injury, and/or property damage or some combination thereof caused by chemicals known as per- and polyfluoroalkyl substances ("PFAS"). BASF is a defendant in the

AFFF Lawsuits in connection with Lodyne, a product that was manufactured by Ciba Corp. (or its predecessor) and for which third parties seek to hold BASF legally liable.

54.    From approximately 1976 until 1991, Ciba Corp. (or its predecessor) sold Lodyne to Ansul, a company that manufactures fire suppression products, including AFFF.  After 1991, Ciba Corp. sold Lodyne to other AFFF manufacturers such as National Foam and Chemguard.

55.    The AFFF Lawsuits include lawsuits currently pending in the Aqueous Film-Forming Foams ("AFFF") Multi-District Litigation located in the United States District Court for the District of South Carolina, Docket No. 2:18-2873(RMG) (the "MDL") as well as all similarly situated lawsuits now pending in any other courts or jurisdictions or which may be asserted in the future, whether in the MDL or in other courts of competent jurisdiction.

56.    The Policies provide coverage for the AFFF Lawsuits.

57.    The AFFF Lawsuits: (a) allege an "occurrence" as that term is defined in the Policies; (b) seek damages for bodily injury, personal injury or property damage (or combination thereof) that occurred during one or more of the policy periods of the Policies (or, with respect to the Ace Policy, during the relevant time period); and (c) seek to impose a legal liability against BASF, as successor-in-interest to Ciba Corp.  The allegations in the AFFF Lawsuits require the Defendant Insurers to pay "all sums" that BASF is obligated to pay that is an "ultimate net loss" as defined in the Policies, including: (a) BASF's litigation costs and expenses in the AFFF Lawsuits; and (b) any judgment or settlement that BASF must satisfy to resolve the AFFF Lawsuits.

58.    Each of the occurrence-based Policies contain a prior insurance or non-cumulation provision that compresses insurance coverage for a continuing injury or damage claims, such as the AFFF Lawsuits, into a singular policy year or, as applicable, years.  As a result, under

applicable law, BASF is entitled to select which policy year or policy years will apply to such claims.

59.     The AFFF Lawsuits seek damages based on causes of action sounding in, *inter alia*, product liability, strict liability, including strict products liability, failure to warn, nuisance, negligence, and trespass.

60.     BASF vigorously has defended the AFFF Lawsuits and disputes all allegations of liability and wrongdoing in the AFFF Lawsuits.  BASF will continue to vigorously defend the AFFF Lawsuits.  The Defendant Insurers have wrongful failed to fund or otherwise participate in BASF's defense of the AFFF Lawsuits.

61.     The Defendant Insurers have breached the Policies by failing and refusing to acknowledge their obligations to pay BASF for the litigation costs and expenses that have been, and will continue to be incurred, to defend the AFFF Lawsuits.

62.     The Defendant Insurers have failed and refused to acknowledge their obligations under the Policies to pay BASF or on its behalf all sums for which BASF may be held legally responsible to resolve the AFFF Lawsuits, whether through settlement, judgment, or otherwise.

63.     None of the exclusions or other policy terms or conditions relied upon by the Defendant Insurers apply to excuse or minimize the Defendant Insurers' obligations to provide coverage for the AFFF Lawsuits.

## PROCEDURAL BACKGROUND

64.     On February 27, 2024, BASF filed an action in the United States District Court for the District of South Carolina, Docket No. 2:24-cv-993-RMG (the "First Filed D.S.C. Action") against certain of the Defendant Insurers.  The First Filed D.S.C. Action seeks insurance coverage for the AFFF Lawsuits.

65.     On March 4, 2024, Underwriters at Lloyd's and London Market Companies filed a retaliatory action against BASF and certain of BASF's insurers in the Supreme Court of the State of New York, New York County, Index No. 651150/2024, which BASF immediately removed to the United States District Court for the Southern District of New York, Docket No. 1:24-cv-01684-JHR (the "Second Filed New York Action").

66.     The Second Filed New York Action is likewise an insurance coverage case where Underwriters at Lloyd's and London Market Companies seek declaratory relief and allege that no insurance coverage is owed to BASF for the AFFF Lawsuits under substantially the same insurance policies that are the subject of the First Filed D.S.C. Action.

67.     Pursuant to the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, on March 7, 2024, BASF filed a Notice of a Potential Tag-Along Action, notifying the Judicial Panel on Multidistrict Litigation that the Second Filed New York Action should be transferred to the MDL pending in the United States District Court for the District of South Carolina.

68.     BASF, as the true plaintiff in this insurance coverage dispute, now has been forced to file this third action in the Superior Court of New Jersey to secure its ability to have its rights to insurance coverage for the AFFF Lawsuits litigated against all of its insurers in the forum of its choice.  See Century Indem. Co. v. Mine Safety Appliances Co., 398 N.J. Super. 422, 438 (App. Div. 2008) (explaining the principle that insurers' improper "declaratory judgment actions" should be dismissed "so as to permit the natural plaintiff's action to proceed in the plaintiff's chosen court.") (internal quotations omitted).  Moreover, the Service of Suit Clause included within Defendants Underwriters at Lloyd's and London Market Companies' Policies confirm this Court, instead of the Second Filed New York Action, is the proper forum for this insurance coverage

dispute because those defendants (which are the plaintiffs in the Second Filed New York Action) are required to submit to the jurisdiction of this Court.

69.     In addition, BASF brings this action to include Defendant Insurers not named in (i) the First Filed D.S.C. Action due to lack of diversity of citizenship with BASF or otherwise or in (ii) the Second Filed New York Action.  Additionally, because this action includes Defendant Insurers not named as defendants in the Second Filed New York Action and additional causes of action, this action is more comprehensive than the Second Filed New York Action.

## **THE POLICIES**

### *The AIG Policies*

70.     During the policy period(s) referenced below, AIG issued or subscribed to at least the following Policies (bearing policy no. 10502; and, with respect to AIU, SCLE80993018, SCLD80993240, 75-1000082, 75-101056, 75-101945, 75-102534, 75-102682, 75-102268, 75-103789; and, with respect to Lexington, bearing policy nos. 10502 and/or GC5503026, GC550326, CN5511281, CN5520301, CN5522173, CN5523810, CN5525208, CN5526319) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| AIG Insurer | Policy Period |
|---|---|
| AIU | April 1, 1977 – April 1, 1978 |
| AIU | April 1, 1978 – April 1, 1979 |
| AIU | April 1, 1979 – April 1, 1980 |
| AIU | April 1, 1980 – April 1, 1981 |
| AIU | April 1, 1981 – April 1, 1982 |
| AIU | April 1, 1982 – April 1, 1983 |
| AIU | April 1, 1983 – April 1, 1984 |
| AIU | April 1, 1984 – April 1, 1985 |
| Granite | April 1, 1976 – April 1, 1977 |
| Granite | April 1, 1978 – April 1, 1979 |
| Granite | April 1, 1979 – April 1, 1980 |

| | |
|---|---|
| Granite | April 1, 1980 – April 1, 1981 |
| Granite | April 1, 1981 – April 1, 1982 |
| Granite | April 1, 1982 – April 1, 1983 |
| Granite | April 1, 1983 – April 1, 1984 |
| Granite | April 1, 1984 – April 1, 1985 |
| ICOSP | April 1, 1976 – April 1, 1977 |
| ICOSP | April 1, 1977 – April 1, 1978 |
| National Union | April 1, 1976 – April 1, 1977 |
| National Union | April 1, 1977 – April 1, 1978 |
| National Union | April 1, 1978 – April 1, 1979 |
| National Union | April 1, 1979 – April 1, 1980 |
| National Union | April 1, 1980 – April 1, 1981 |
| National Union | April 1, 1981 – April 1, 1982 |
| National Union | April 1, 1982 – April 1, 1983 |
| National Union | April 1, 1983 – April 1, 1984 |
| National Union | April 1, 1984 – April 1, 1985 |
| Lexington | April 1, 1976 – April 1, 1977 |
| Lexington | April 1, 1977 – April 1, 1978 |
| Lexington | April 1, 1978 – April 1, 1979 |
| Lexington | April 1, 1979 – April 1, 1980 |
| Lexington | April 1, 1980 – April 1, 1981 |
| Lexington | April 1, 1981 – April 1, 1982 |
| Lexington | April 1, 1982 – April 1, 1983 |
| Lexington | April 1, 1983 – April 1, 1984 |
| Lexington | April 1, 1984 – April 1, 1985 |

### *The Allianz Policies*

71.     During the policy period(s) referenced below, Allianz issued or subscribed to at least the following Policies (bearing policy no. 10502) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Allianz Insurer | Policy Period |
|---|---|
| Allianz Global | April 1, 1976 – April 1, 1977 |
| Allianz Global | April 1, 1977 – April 1, 1978 |

| Allianz AG | April 1, 1977 – April 1, 1978 |
| Allianz AG | April 1, 1978 – April 1, 1979 |
| Allianz AG | April 1, 1979 – April 1, 1980 |
| Allianz AG | April 1, 1980 – April 1, 1981 |
| Allianz AG | April 1, 1981 – April 1, 1982 |
| Allianz AG | April 1, 1982 – April 1, 1983 |
| Allianz AG | April 1, 1983 – April 1, 1984 |
| Allianz AG | April 1, 1984 – April 1, 1985 |
| Allianz AG | April 1, 1985 – April 1, 1986 |
| Interstate | April 1, 1976 – April 1, 1977 |

### The Allstate Policies

72.     During the policy period(s) referenced below, Allstate issued or subscribed to at least the following Policies (bearing policy nos.: 10502 and/or 63-001-845; 63-002-959; 63-004-325; 63-005-611; 63-006-604; 63-007-791; and 63-08-651) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
| --- | --- |
| Allstate | April 1, 1976 – April 1, 1977 |
| Allstate | April 1, 1977 – April 1, 1978 |
| Allstate | April 1, 1978 – April 1, 1979 |
| Allstate | April 1, 1979 – April 1, 1980 |
| Allstate | April 1, 1980 – April 1, 1981 |
| Allstate | April 1, 1981 – April 1, 1982 |
| Allstate | April 1, 1982 – April 1, 1983 |

### The AXA Policies

73.     During the policy period(s) referenced below, AXA issued or subscribed to at least the following Policies (bearing policy no. 10502) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| AXA Insurer | Policy Period |
|---|---|
| AXA AG | April 1, 1977 – April 1, 1978 |
| AXA AG | April 1, 1978 – April 1, 1979 |
| AXA Company | April 1, 1979 – April 1, 1980 |
| AXA Company | April 1, 1980 – April 1, 1981 |
| AXA Company | April 1, 1981 – April 1, 1982 |
| AXA Company | April 1, 1982 – April 1, 1983 |
| AXA Company | April 1, 1983 – April 1, 1984 |
| AXA Company | April 1, 1984 – April 1, 1985 |
| AXA Company | April 1, 1985 – April 1, 1986 |
| Greenwich | April 1, 1984 – April 1, 1985 |

### *The London Policies*

74.     During the policy period(s) referenced below, Underwriters at Lloyd's and the London Market Companies (together, the "London Policies") issued or subscribed to at least the following Policies at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Policy Number | Policy Period |
|---|---|
| UHL0586 | April 1, 1976 – April 1, 1977 |
| UJL1058 | April 1, 1977 – April 1, 1978 |
| UJL1059 | April 1, 1977 – April 1, 1978 |
| UKL0561 | April 1, 1978 – April 1, 1979 |
| UKL0562 | April 1, 1978 – April 1, 1979 |
| ULL0509 | April 1, 1979 – April 1, 1980 |
| ULL0510 | April 1, 1979 – April 1, 1980 |
| UMP0252 | April 1, 1980 – April 1, 1981 |
| UMP0253 | April 1, 1980 – April 1, 1981 |
| UNP0139 | April 1, 1981 – April 1, 1982 |
| UNP0140 | April 1, 1981 – April 1, 1982 |
| KY011082 | April 1, 1982 – April 1, 1983 |
| KY011182 | April 1, 1982 – April 1, 1983 |
| KY042983 | April 1, 1983 – April 1, 1986 |

| | |
|---|---|
| KY043083 | April 1, 1983 – April 1, 1984 |
| PY211684 | April 1, 1984 – April 1, 1985 |
| 10502 (INSCO) | April 1, 1979 – April 1, 1980 |
| 10502 (INSCO) | April 1, 1980 – April 1, 1981 |
| 10502 (INSCO) | April 1, 1981 – April 1, 1982 |

### *The Employers Policies*

75.     During the policy period(s) referenced below, Employers issued or subscribed to at least the following Policies (bearing policy no. 10502) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---|---|
| Employers | April 1, 1978 – April 1, 1979 |
| Employers | April 1, 1979 – April 1, 1980 |
| Employers | April 1, 1980 – April 1, 1981 |
| Employers | April 1, 1981 – April 1, 1982 |

### *The Everest Policies*

76.     During the policy period(s) referenced below, Everest issued or subscribed to at least the following Policies (bearing policy nos. 10502 and/or DXC901094 or DXCDX0204) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---|---|
| Everest | April 1, 1976 – April 1, 1977 |
| Everest | April 1, 1976 – April 1, 1977 |
| Everest | April 1, 1977 – April 1, 1978 |
| Everest | April 1, 1978 – April 1, 1979 |

***The First State Policies***

77.    During the policy period(s) referenced below, First State issued or subscribed to at least the following Policies (bearing policy no. 10502) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---|---|
| First State | April 1, 1976 – April 1, 1977 |

***The HDI Policies***

78.    During the policy period(s) referenced below, HDI Company and HDI SE issued or subscribed to at least the following Policies (bearing policy no. 10502 and/or 49/99/6148/01) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| HDI Insurer | Policy Period |
|---|---|
| HDI SE | April 1, 1976 – April 1, 1977 |
| HDI SE | April 1, 1977 – April 1, 1978 |
| HDI SE | April 1, 1978 – April 1, 1979 |
| HDI SE | April 1, 1979 – April 1, 1980 |
| HDI SE | April 1, 1980 – April 1, 1981 |
| HDI SE | April 1, 1981 – April 1, 1982 |
| HDI SE | April 1, 1982 – April 1, 1983 |
| HDI SE | April 1, 1983 – April 1, 1984 |
| HDI SE | April 1, 1984 – April 1, 1985 |
| HDI SE | April 1, 1985 – April 1, 1986 |
| HDI Company | April 1, 1978 – April 1, 1979 |
| HDI Company | April 1, 1979 – April 1, 1980 |
| HDI Company | April 1, 1980 – April 1, 1981 |
| HDI Company | April 1, 1981 – April 1, 1982 |
| HDI Company | April 1, 1982 – April 1, 1983 |
| HDI Company | April 1, 1983 – April 1, 1984 |
| HDI Company | April 1, 1984 – April 1, 1985 |

| HDI Company | April 1, 1985 – April 1, 1986 |

### *The Chubb Policies*

79.     During the policy period(s) referenced below, INA issued or subscribed to at least the following Policies (bearing policy nos.: 10502 and/or XCP12380; XCP14316; XCP14305; XCP143752; XCP144038; XCP144554; XCP144296; XCP145296; XCPG0313347-3; and G23733298) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Chubb Insurer | Policy Period |
|---|---|
| INA | April 1, 1977 – April 1, 1978 |
| INA | April 1, 1978 – April 1, 1979 |
| INA | April 1, 1979 – April 1, 1980 |
| INA | April 1, 1980 – April 1, 1981 |
| INA | April 1, 1981 – April 1, 1982 |
| INA | April 1, 1982 – April 1, 1983 |
| INA | April 1, 1983 – April 1, 1984 |
| INA | April 1, 1984 – April 1, 1985 |
| INA | April 1, 1985 – April 1, 1986 |
| Federal | April 1, 1977 – April 1, 1978 |
| Federal | April 1, 1978 – April 1, 1979 |
| Federal | April 1, 1984 – April 1, 1985 |
| Ace | Dec. 31, 2007 – Dec. 31, 2008 |

### *The Munich Policy*

80.     During the policy period(s) referenced below, Munich issued or subscribed to at least the following Policies (bearing policy no. 10502 and/or M0691176) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---|---|
| Munich | April 1, 1976 – April 1, 1977 |

### *The National Casualty Policies*

81.     During the policy period(s) referenced below, National Casualty issued or subscribed to at least the following Policies (bearing policy no. 10502 and/or XU000243) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---|---|
| National Casualty | April 1, 1985 – April 1, 1986 |

### *The New England Policies*

82.     During the policy period(s) referenced below, New England and/or New England Re issued or subscribed to at least the following Policies (bearing policy no. 10502 and/or 000051) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---|---|
| New England | April 1, 1984 – April 1, 1985 |
| New England Re | April 1, 1984 – April 1, 1985 |

### *The RSA Policies*

83.     During the policy period(s) referenced below, RSA issued or subscribed to at least the following Policies (bearing policy no. 10502) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---|---|
| RSA | April 1, 1984 – April 1, 1985 |

### *The TIG Policies*

84.     During the policy period(s) referenced below, TIG issued or subscribed to at least the following Policies (bearing policy nos.: 10502 and/or GMX00091; GMX00523; GMX01136;

-26-

GMX01654; GMX02186; and GMX02611) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---------|---------------|
| TIG | April 1, 1979 – April 1, 1980 |
| TIG | April 1, 1980 – April 1, 1981 |
| TIG | April 1, 1981 – April 1, 1982 |
| TIG | April 1, 1982 – April 1, 1983 |
| TIG | April 1, 1983 – April 1, 1984 |
| TIG | April 1, 1984 – April 1, 1985 |

### *The Travelers Policies*

85.     During the policy period(s) referenced below, Travelers issued or subscribed to at least the following Policies (bearing policy nos.: 10502 and/or 01 XN 999 WCA; 01 XN 1001 WCA; 01 XN 1311 WCA; 01 XN 1313 WCA; 01 XN 1771 WCA;  01 XN 2167 WCA;  01 XN 2585 WCA;  01 XN 2993 WCA; 01 XN 3351 WCA; 01 XN 3687 WCA; 01 XN 4124 WCA; and 01 XN 4868 WCA) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---------|---------------|
| Travelers | April 1, 1976 – April 1, 1977 |
| Travelers | April 1, 1977 – April 1, 1978 |
| Travelers | April 1, 1978 – April 1, 1979 |
| Travelers | April 1, 1979 – April 1, 1980 |
| Travelers | April 1, 1980 – April 1, 1981 |
| Travelers | April 1, 1981 – April 1, 1982 |
| Travelers | April 1, 1982 – April 1, 1983 |
| Travelers | April 1, 1983 – April 1, 1984 |
| Travelers | April 1, 1984 – April 1, 1985 |
| Travelers | April 1, 1985 – April 1, 1986 |

### *The Twin City Policies*

86.     During the policy period(s) referenced below, Twin City issued or subscribed to at least the following Policies (bearing policy no. 10502) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---------|---------------|
| Twin City | April 1, 1982 – April 1, 1983 |
| Twin City | April 1, 1983 – April 1, 1984 |
| Twin City | April 1, 1984 – April 1, 1985 |
| Twin City | April 1, 1985 – April 1, 1986 |

### *The Westport Policies*

87.     During the policy period(s) referenced below, Westport issued or subscribed to at least the following Policies (bearing policy no. 10502) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---------|---------------|
| Westport | April 1, 1976 – April 1, 1977 |
| Westport | April 1, 1977 – April 1, 1978 |

### *The Zurich Policies*

88.     During the policy period(s) referenced below, Zurich issued or subscribed to at least the following Policies (bearing policy no. 10502) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---------|---------------|
| Zurich | April 1, 1977 – April 1, 1978 |
| Zurich | April 1, 1981 – April 1, 1982 |
| Zurich | April 1, 1982 – April 1, 1983 |
| Zurich | April 1, 1983 – April 1, 1984 |
| Zurich | April 1, 1984 – April 1, 1985 |

| | |
|---|---|
| Zurich | April 1, 1985 – April 1, 1986 |

### *The Safety Policies*

89.     During the policy period(s) referenced below, Safety issued or subscribed to at least the following Policies (bearing policy no. 10502) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---|---|
| Safety | April 1, 1984 – April 1, 1985 |

### *The Midstates Policies*

90.     During the policy period(s) referenced below, Midstates issued or subscribed to at least the following Policies (bearing policy no. 10502) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---|---|
| Midstates | April 1, 1984 – April 1, 1985 |

### *The European Re Policies*

91.     During the policy period(s) referenced below, European Re issued or subscribed to at least the following Policies (bearing policy no. 10502) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---|---|
| European Re | April 1, 1979 – April 1, 1980 |
| European Re | April 1, 1980 – April 1, 1981 |

*The Swiss Re Policies*

92.     During the policy period(s) referenced below, European Re issued or subscribed to at least the following Policies (bearing policy no. 10502) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---------|---------------|
| Swiss Re | April 1, 1978 – April 1, 1979 |

*The Pacific Policies*

93.     During the policy period(s) referenced below, Pacific issued or subscribed to at least the following Policies (bearing policy no. 10502) at one or more excess layers, under which insurance coverage for the AFFF Lawsuits is owed to BASF:

| Insurer | Policy Period |
|---------|---------------|
| Pacific | April 1, 1985 – April 1, 1986 |

## CAUSES OF ACTION

### COUNT I
**(Declaratory Judgment)**
**(Defense Costs and Litigation Expenses)**

94.     BASF repeats, realleges, and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

95.     Under the Policies, the Defendant Insurers have a duty to pay defense costs and litigation expenses paid or incurred by BASF in connection with the AFFF Lawsuits.

96.     BASF has paid and incurred substantial defense costs and litigation expenses, which are covered under the Policies, to defend the AFFF Lawsuits.

97.     The Defendant Insurers have refused to pay and have refused to acknowledge their obligation to pay for any defense costs and litigation expenses under the Policies incurred, and to be incurred, by BASF in connection with the AFFF Lawsuits.

98.     The Defendant Insurers' failure and refusal to pay BASF for its defense costs and litigation expenses incurred, and to be incurred, in connection with the AFFF Lawsuits constitutes a breach of the Policies and has caused, and will continue to cause, BASF to incur significant damages that are covered by the Policies.

99.     As a result, an actual and justiciable controversy exists between BASF and the Defendant Insurers regarding the Defendant Insurers' obligations to pay defense costs and litigation expenses under the Policies.

## COUNT II
### (Breach of Contract)
### (Defense Costs and Litigation Expenses)

100.     BASF repeats, realleges, and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

101.     Under the Policies, the Defendant Insurers have a duty to pay defense costs and litigation expenses paid or incurred by BASF in connection with the AFFF Lawsuits.

102.     BASF has paid and incurred substantial defense costs and litigation expenses, which are covered under the Policies, to defend the AFFF Lawsuits.

103.     The Defendant Insurers have refused to pay and have refused to acknowledge their obligation to pay for any defense costs and litigation expenses due and owing under the Policies incurred by BASF in connection with the AFFF Lawsuits.

104.     The Defendant Insurers' failure and refusal to pay BASF for its defense costs and litigation expenses incurred, and to be incurred, in connection with the AFFF Lawsuits constitutes

a breach of the Policies and has caused, and will continue to cause, BASF to incur significant damages that are covered by the Policies.

## COUNT III
### (Declaratory Judgment)
### (Indemnification Obligations)

105.     BASF repeats, realleges, and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

106.     The Defendant Insurers have a duty to pay all sums incurred by, or to be incurred by, BASF to resolve the AFFF Lawsuits through settlement or satisfaction of any judgment entered, or otherwise.

107.     The Defendant Insurers have refused to pay or have refused to acknowledge their indemnity obligations for any settlements or judgments incurred by BASF in the AFFF Lawsuits.

108.     Because of the Defendant Insurers' failure and refusal to pay on behalf of BASF, or to acknowledge its indemnity obligations for, any settlements or judgments incurred or to be incurred in connection with the AFFF Lawsuits, an actual and justiciable controversy exists between BASF and the Defendant Insurers regarding the Defendant Insurers' obligations under the Policies.

## COUNT IV
### (Attorneys' Fees Under Rule 4:42–9(a)(6))

109.     BASF repeats, realleges, and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

110.     In addition to the significant defense expenses BASF already has incurred defending itself in the AFFF Lawsuits, BASF has been forced to file this action as a result of the Defendant Insurers' refusal to honor their coverage obligations to defend BASF and as a direct result of certain Defendant Insurers filing the retaliatory Second Filed New York Action.

111.    Because New Jersey discourages insurance companies from attempting to avoid their contractual obligations, BASF is presumptively entitled to recover all of its coverage counsel fees and expenses incurred in connection with this action to vindicate its rights to coverage if it is a successful claimant under Rule 4:42-9(a)(6).

112.    Upon successfully establishing that the Defendant Insurers have a duty to defend and/or indemnify BASF in connection with the AFFF Lawsuits, the Defendant Insurers will also be required to reimburse BASF for all of its coverage counsel fees and expenses incurred in connection with this coverage action.

## PRAYER FOR RELIEF

WHEREFORE, BASF respectfully demands judgment against the Defendant Insurers as follows:

A.    As to the First Count, a declaration that the Defendants Insurers are required to pay BASF's past and future defense costs and litigation expenses incurred, and to be incurred, to defend the AFFF Lawsuits;

B.    As to the Second Count: award BASF compensatory, consequential, and other damages that BASF has suffered, in an amount to be determined at trial;

C.    As to the Third Count: a declaration that the Defendant Insurers are required to pay all sums incurred by BASF in connection with the resolution of the AFFF Lawsuits, whether resolved by settlement, judgment, or otherwise;

D.    As to the Fourth Count: an award of BASF's coverage counsel fees and expenses incurred in this action under Rule 4:42-9(a)(6);

E.    As to all Counts: an order obligating the Defendant Insurers to pay (i) all costs incurred by BASF in bringing this action, including attorneys' fees and expenses and experts'

fees, (ii) pre- and post-judgment interest; and (iii) such other and further relief as this

Court may deem just and proper.

Respectfully Submitted,

**LOWENSTEIN SANDLER LLP**

Dated:  March 13, 2024

By: /s/ *Lynda A. Bennett*
   Lynda A. Bennett
   Eric Jesse
   Heather Weaver

*Attorneys for Plaintiff BASF Corporation*

## <u>DESIGNATION OF TRIAL COUNSEL</u>

PLEASE TAKE NOTICE that pursuant to the provisions of <u>Rule</u> 4:25-4, Plaintiff BASF Corporation, hereby designates Lynda A. Bennett as its trial counsel in the above-captioned matter.

**LOWENSTEIN SANDLER LLP**

Dated: March 13, 2024

By: _/s/ Lynda A. Bennett_

Lynda A. Bennett
Eric Jesse
Heather Weaver

*Attorneys for Plaintiff BASF Corporation*


## <u>JURY DEMAND</u>

BASF Corporation hereby demands trial by a jury as to all triable issues.

**LOWENSTEIN SANDLER LLP**

Dated: March 13, 2024

By: _/s/ Lynda A. Bennett_

Lynda A. Bennett
Eric Jesse
Heather Weaver

*Attorneys for Plaintiff BASF Corporation*

## **RULE 4:5-1 CERTIFICATION**

Pursuant to Rule 4:5-1, I hereby certify that the matter in controversy in the within Complaint is not the subject of any other action pending in the Court or of any arbitration proceeding, except with respect to the following actions:

- *BASF Corporation v. AIU Insurance Company, et al.*, pending in the United States District Court for the District of South Carolina, Docket No. 2:24-cv-993-RMG.

- *Certain Underwriters at Lloyd's, London, et al. v. BASF Corporation, et al.*, pending in the United States District Court for the Southern District of New York, Docket No. 1:24-cv-1684-JHR, which was removed from the Supreme Court of the State of New York, New York County, Index No. 651150/2024.

No other action or arbitration proceeding regarding the matter in controversy is contemplated by Plaintiff. Plaintiff is not aware at this time of any other parties who should be joined in this action.

**LOWENSTEIN SANDLER LLP**

Dated:  March 13, 2024                    By: /s/ *Lynda A. Bennett*
                                                        Lynda A. Bennett
                                                        Eric Jesse
                                                        Heather Weaver

                                                        *Attorneys for Plaintiff BASF Corporation*

# EXHIBIT B

SUPERIOR COURT OF NEW JERSEY
MIDDLESEX COUNTY
LAW DIVISION, CIVIL PART
DOCKET NO. MID-L-001648-24
APP. DIV NO.

1

2

3    BASF CORPORATION, as successor   )
     in interest to CIBA CORPORATION,)

4                                     )
                   Plaintiff,         )        TRANSCRIPT
5                                     )
            v.                        )           OF
6                                     )
     ACE AMERICAN INSURANCE           )      ORAL ARGUMENT
7    COMPANY, et al.,                 )    (MOTION TO STAY CASE)
                                      )
8                  Defendant.         )

9
                          Place:  Middlesex County Courthouse
10                                (Via Zoom)

11                        Date:  September 20, 2024

12

BEFORE:
13
       HONORABLE GARY K. WOLINETZ, J.S.C.
14

15   TRANSCRIPT ORDERED BY:

16     LYNDA A. BENNETT, ESQ. (Lowenstein Sandler, LLP)

17

18   APPEARANCES:

19     LYNDA A. BENNETT, ESQ. (Lowenstein Sandler, LLP)
       CRAIG DASHIEL, ESQ.  (Lowenstein Sandler, LLP)
20     Attorneys for the Plaintiff, BASF Corporation

21

22                         Transcriber, Kelly A. Ashlaw
23                         G&L TRANSCRIPTION OF NJ
                           330 Changebridge Road, Suite 101
24                         Pine Brook, New Jersey  07058
                           www.gltranscriptsnj.com
25                         transcripts@gltranscriptsnj.com

                           Audio Recorded
                           Recording Operator - Aneela Naqvi

```
 1    APPEARANCES (CONT.):

 2      STEFANO V. CALOGERO, ESQ. (Windels Marx)
        Attorney for the Defendant, Allstate Insurance Company
 3
        JEFFREY M. BEYER, ESQ. (Riker Danzig)
 4      ALEXANDER S. LORENZO, ESQ. (Alston & Bird)
        ELIZABETH A. BUCKEL, ESQ. (Alston & Bird)
 5      Attorneys for Defendants, AIU Insurance Company,
        Granite State Insurance Company, Insurance Company of
 6      the State of Pennsylvania, Lexington Insurance Company,
        and National Union Fire Insurance Company of Pittsburgh, PA
 7
 8      ROBERT F. WALSH, ESQ. (White and Williams, LLP)
        LYNNDON K. GROFF, ESQ. (White and Williams, LLP)
 9      Attorneys for the Defendants, ACE American Insurance
        Company and Federal Insurance Company
10
11      MARCIE GOLDSTEIN KOKALAS, ESQ. (Goldberg Segalla)
        Attorney for Defendant, National Casualty Company
12
        LYNN K. NEUNER, ESQ. (Simpson Thatcher & Bartlet)
13      CONOR MERCADANTE, ESQ. (Simpson Batcher & Bartlet)
        Attorneys for the Defendants, Travelers Casualty
14      Surety Company and the Travelers Indemnity Company
15
        KATIE FALKENBERG, ESQ. (Amundsen Davis Law)
16      JILLIAN DENNEHY, ESQ. (Amundsen Davis Law)
        Attorneys for the Defendants, Tig Insurance Company
17      and Everest Reinsurance Company
18
        WILLIAM E. MCGRATH, ESQ. (Dilworth Paxson, LLP)
19      Attorney for the Defendants
20
        KATHERINE E. TAMMARO, ESQ. (Wilson Elser)
21      WAYNE S. KARBAL, ESQ. (Karbal Cohen Economou Silk &
        Dunne, LLC)
22      Attorneys for the Defendants, First State Insurance
        Company, New England Reinsurance Company, um, and Twin
23      City Fire Insurance Company, The Hartford Companies
24      IAN MCLIN, ESQ. (Saul Ewing, LLP)
        RYAN E. GALLEGHER, ESQ. (Saul Ewing, LLP)
25      Attorneys for the Defendant, Zurig Reinsurance Group
```

3

```
 1      MORGAN MILLER, ESQ. (Rivkin Radler)
        Attorney for the Defendants, Allianz Versicherungs-Ag,
 2      Interstate Fire and Casualty Company, and Fireman's Fund
        Insurance Company
 3
        JOHN OHL, ESQ. (Mendes and Mount)
 4      Attorney for the Defendants, Britain Underwriters at
        Lloyds of London, certain London Market Insurance Companies,
 5      and Safety National Casualty Corporation
 6
        DANIEL A. SHILLING, ESQ. (Kaufman Borgeest & Ryan, LLP)
 7      Attorney for the Defendant, Mid States Reinsurance
        Corporation
 8
        DALTON LUKE, ESQ. (Cline & Co)
 9      Attorney for the Defendants, Coliseum Reinsurance Company,
        Axa Verastrong AG, and Greenwich Insurance Company
10
        JOHN R. EWELL, ESQ.  (Cozen O'Connor)
11      Attorney for the Defendant, Employers Mutual Casualty
12
        ROBIN RUBINOWITZ, ESQ. (Gimigliano, Mauriello & Maloney)
13      Attorney for the Defendant, Travelers
14
        MICHAEL J. TRICARICO, ESQ. (Kennedys Law)
15      Attorney for the Defendant, Swiss Reinsurance - Westport
16
17
18
19
20
21
22
23
24
25
```

1                                I N D E X

2   ARGUMENT                                            PAGE

3      BY:  Ms. Bennett                          36, 52, 55

4      BY:  Mr. Calogero                              43

5      BY:  Mr. Lorenzo                            49, 53

6

7

8   THE COURT

9      Decision                                       59

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy                                              5

```
 1                    (Proceeding commenced 1:32:53 p.m.)

 2              THE COURT:  All right.  Good afternoon,

 3    counsel.  This is Judge Wolinetz.  This is the case

 4    captioned BASF Corporation v. ACE American Insurance

 5    Company.  Superior Court of New Jersey, Law Division,

 6    Middlesex County.  Docket number MID-L-1648-24.  May I

 7    please have the appearances of counsel?

 8              MS. BENNETT:  Good afternoon, Your Honor.

 9    This is Lynda Bennett and I've got my partner Craig

10    Dashiel with me here from Lowenstein Sandler, on behalf

11    of the plaintiff BASF Corporation.

12              THE COURT:  Who's gonna be speaking for you.

13    You?

14              MS. BENNETT:  Lynda Bennett.

15              THE COURT:  Okay.

16              MR. CALOGERO:  Um, good afternoon, Your

17    Honor.  It's, uh, (Indiscernible) Calogero, uh, from

18    Windels Marx.  Um, uh, appearing for Allstate Insurance

19    Company.

20              THE COURT:  Now sir, will you -- will you bet

21    taking the lead as to all the insurers, or will

22    everyone or most everyone -- or who is gonna be

23    speaking today on behalf of the -- of the insurers?  If

24    you know.

25              MR. CALOGERO:  Your Honor, I -- I think I
```

Colloquy                                    6

1   will be taking the lead on the argument from the

2   beginning, uh, of our -- of our segment of the

3   argument.

4           I -- I can't say that there might not be

5   other people who want to join in.  I can't -- there may

6   be, you know, a few others.  But I don't this it's ev

7   -- it's not gonna be every office.

8           THE COURT:  All right.  And sir, I apologize,

9   but I -- I'm -- I'm looking at literally a very small

10  Hollywood Squares motif if anyone remembers that.  And

11  I just -- just remind me of your name, sir.

12          MR. CALOGERO:  Steve Calogero.

13          THE COURT:  I apologize for that.

14          MR. CALOGERO:  It's not --

15          THE COURT:  It's just (indiscernible).

16          MR. CALOGERO:  It's not Paul Lynde.

17          THE COURT:  Yeah, ha, ha.

18          MR. CALOGERO:  Ha, ha.

19          THE COURT:  Yeah, well, I -- I --

20          MR. CALOGERO:  For those of us who remember

21  that.

22          THE COURT:  I think that's funny.  But I

23  don't know if the -- if the junior people will

24  appreciate that.

25          MR. CALOGERO:  Ha, ha, ha.

Colloquy 7

1          THE COURT:  In any event, counsel, you can

2     continue your roll call.

3          MR. BEYER:  Good afternoon, Your Honor.  This

4     is Jeffrey Beyer, B-E-Y-E-R, from Riker Danzig.  And

5     with me are colleagues from Alston & Bird, Alexander

6     Lorenzo and Elizabeth Buckel.

7          We represent the defendants AIU Insurance

8     Company, Granite State Insurance Company, Insurance

9     Company of the State of Pennsylvania, Lexington

10    Insurance Company, and National Union Fire Insurance

11    Company of Pittsburgh, PA.

12         MR. WALSH:  Good afternoon, Your Honor.  This

13    is Robert Walsh from the firm of White and Williams.

14    We represent ACE American Insurance Company, and

15    Federal Insurance Company.  And my colleague Lynndon

16    Groff is also on the Zoom call.

17         MS. GOLDSTEIN KOKALAS:  Good afternoon,

18    Judge.  Marcie Goldstein Kokalas at Goldberg Segalla

19    for National Casualty Company.

20         MS. NEUNER:  Good afternoon, Your Honor.

21    This is Lynn Neuner of Simpson Thatcher and Bartlet.

22    I'm joined by my colleague Conor Mercadante.  And we

23    are here for Travelers.  Specifically Travelers

24    Casualty Surety Company and the Travelers Indemnity

25    Company.

Colloquy                                                8

1              MS. FALKENBERG:  Good morning.

2              MR. MCGRATH:  Good morning, Your Honor.

3              MS. FALKENBERG:  Oh, go ahead.

4              MR. MCGRATH:  Go ahead, Katie.

5              MS. FALKENBERG:  Okay.  This is Katie

6    Falkenberg of Amundsen Davis.  I'm joined with -- um,

7    I'm joined with Jillian Dennehy.  Uh, we represent Tig

8    Insurance Company and Everest Reinsurance Company.

9              MR. MCGRATH:  Good afternoon, Your Honor.

10   William McGrath with Dilworth Paxson.

11             THE COURT:  All right, sir, your sort of --

12   you seem to have vanished.  You may want to check your

13   connection.  I can't hear a word you're saying.  If

14   you're saying anything.  All right, we can continue.

15   He'll -- he'll come back.

16             MS. TAMMARO:  Good afternoon, Your Honor.

17   Katherine Tammaro from Wilson Elser.  With me is my

18   colleague Wayne Karbal from Karbal Cohen Economou Silk

19   & Dunne.  We represent, um, First State Insurance

20   Company, New England Reinsurance Company, um, and Twin

21   City Fire Insurance Company, The Hartford Companies.

22             MR. KARBAL:  Good afternoon, Your Honor.

23             THE COURT:  Good afternoon.

24             MR. MCLIN:  Good afternoon, Your Honor.  Uh,

25   this is Ian McLin from Saul Ewing.  I'm here with my

Colloquy                                    9

1    colleague Ryan Gallegher.  Uh, and we represent, uh,

2    Zurig Reinsurance Group.

3             THE COURT:  Has everyone entered their

4    appearance.

5             MR. MCGRATH:  Yes, Your Honor.  With

6    apologies for the -- uh, I'll blame it on technical

7    difficulties, rather than a 4 year old Portuguese Water

8    dog.  Um, but William McGrath for -- from Dilworth

9    Paxson for Munich Reinsurance American, Inc.

10            MS. MILLER:  Good afternoon, Your Honor.

11   This is Morgan Miller of Rivkin Radler, and we're

12   counsel for, um, Allianz Versicherungs-Ag, Interstate

13   Fire and Casualty Company, and Fireman's Fund Insurance

14   Company, which was incorrectly (indiscernible) as

15   Allianze Global Risk US Insurance Company.

16            MR. EWELL:  Good afternoon, Your Honor.  John

17   Ewell of Mendeza Mount.  We represent defendants

18   Britain Underwriters at Lloyds of London, certain

19   London Market Insurance Companies, and Safety National

20   Casualty Corporation.  We do not take any position in

21   today's motion.  We're just here to observe.

22            MS. RUBINOWITZ:  Good afternoon, Your Honor.

23            MR. SCHILLING:  Good afternoon, Your Honor.

24            MR. LUKE:  Good afternoon, Your Honor.

25   Sorry.

1           MR. SHILLING:  Good afternoon, Your Honor.

2   Daniel Shilling, Kaufman Borgeest & Ryan, for defendant

3   Mid States Reinsurance Corporation.

4           MR. LUKE:  Good afternoon.  Uh, Dalton Luke

5   of Cline and Co.  I'm representing Coliseum Reinsurance

6   Company, Axa Verastrong AG, and Greenwich Insurance

7   Company.

8           MR. EWELL:  Good afternoon, Your Honor.  John

9   Ewell of Cozen O'Connor, for Employers Mutual Casualty.

10          MS. RUBINOWITZ:  And uh, good afternoon, Your

11  Honor.  Um, Robin Rubinowitz of Gimigliano Mauriello &

12  Maloney, also for Travelers.

13          THE COURT:  Anyone else?  All right.

14          MR. TRICARICO:  Your Honor, Michael Tricar --

15  Michael Tricarico from Kennedys, on behalf of, uh,

16  Swiss -- Swiss Re in Westport.

17          THE COURT:  Anyone else?  All right.  Well,

18  you should thank the -- the fact that -- the fact that

19  this case happened to fall on our virtual days, where

20  every three months we -- we are -- we are required to

21  have a virtual day, because I am not physically in the

22  courtroom.

23          I am at home, but -- because I would have

24  required all of you to be -- to be in my courtroom on a

25  motion of this significance, in -- in beautiful New

Colloquy                                    11

1   Brunswick, New Jersey.  So whether you think that is

2   good or bad, it is -- it is a fact.

3          This is a motion -- there's -- as best as I

4   can tell, and tell me if I'm wrong, that there are

5   three separate motions.  There's a motion to stay,

6   there's a motion to extend time to respond to

7   counterclaims, and there's also a no -- a motion to

8   stay time to serve a complaint, or in the alternative

9   for substitute service.

10          Ms. Bennett, is that all -- the -- the

11   motions that are before me that you're aware of?

12          MS. BENNETT:  Uh, yes, Your Honor, for BASF.

13   And just to clarify, I'll be addressing the motion to

14   stay.  Um, and to the extent necessary, the motion on

15   the counterclaim and the lack of prosecution, Mr.

16   Dashiel will weigh in.

17          THE COURT:  All right.  Very good.  First of

18   all, I want to thank you for the excellent quality of

19   the briefs that were provided to me.  I have read every

20   scrap of paper that you have submitted to me.  It's all

21   very good work.

22          And I would just ask any of the -- any of the

23   lead lawyers who are arguing today, to pass on my words

24   of thanks to the people who are under you who perhaps

25   drafted many of these mo -- many of these -- many of

Colloquy                                         12

1    these papers.

2              So let's start with a few question for -- for

3    BSA -- BASF.  And what I typically do -- I don't know

4    how many of you have ever been before me -- what I

5    typically do is I ask -- based upon my review of the

6    case law, and my review of all of your papers, again, I

7    have read every scrap of paper you've giv -- you've

8    submitted to me -- is I ask counsel a series of

9    questions beginning with -- beginning here with BS --

10   BASF, and then I then proceed to ask the lead counsel

11   for the defendant or defendants additional questions.

12   After I ask those questions, I then -- you will then be

13   -- I then ask -- ask you to make -- present whatever

14   arguments you have, noting that I've read everything.

15   And I cannot guarantee that I won't interrupt you

16   again.  But at least you will certainly know that I've

17   read everything.  So let's begin with -- with my

18   questions for BASF.

19             So the first question I have is, what law or

20   case permits BASF to stay its own case?

21             MS. BENNETT:  Uh, Your Honor, that would be

22   the Sensient Color (phonetic) and Miner Safety

23   (phonetic) -- we would rely on those two cases.  And

24   the public policy that drives those two cases, which is

25   that BASF is the true plaintiff is -- in this insurance

Colloquy                                    13

1    coverage dispute.

2           We have chosen the forum that we believe is

3    most appropriate, which is South Carolina, for all of

4    the reasons that are set forth in our briefing papers.

5           And the upshot of Sensient Color and Mine

6    Safety together is that we -- as the true plaintiff,

7    the coverage case should proceed in the jurisdiction of

8    the policyholder's choosing.

9           Which is why we filed our first -- uh, filed

10   action in South Carolina.  And then, uh, moved -- went

11   through the series of procedural hoops that we needed

12   to, to get, uh, London's competing action moved down to

13   South Carolina.

14          And as we stated in our complaint when we

15   filed this action, this was really filed at -- from a

16   pro -- protective position of ultimately being able to

17   proceed in -- in the jurisdiction of our choice.

18          And no disrespect to Your Honor, New Jersey

19   is our second choice.  South Carolina is our clear

20   first choice.

21          THE COURT:  All right, counsel.  Well let's

22   try not to make this a political debate where I ask a

23   question, which I think requires a simple case or -- or

24   law, and then we go on to what you really want to say.

25          Because it'll -- we'll -- we'll end this argu

Colloquy                                        14

1    -- if we -- if we continue in this manner, we'll end

2    this argument sometime around 5:00.

3              So let's just -- if I ask a question, just

4    try to just answer my question.  And I promise you, I

5    promise you and all counsel, that you'll have a full

6    opportunity to -- to respond.

7              So the second -- the second question that I

8    have is, BA -- BASF elected to prosecute this case in

9    Middlesex County.  And explain to me why -- and you

10   said -- I think you -- you described it as having the

11   most -- either the most comprehensive set of parties,

12   or something like that, and tell me why its election

13   should not be enforced?

14             MS. BENNETT:  To litigate in Middlesex

15   County?

16             THE COURT:  In Middle -- in New Jersey.

17             MS. BENNETT:  Well we've elected to file in

18   New Jersey, again as a -- as a defensive mechanism,

19   which is why we're seeking the stay.

20             THE COURT:  I under -- I understand that.

21   But didn't you describe -- didn't you describe it as --

22   I -- I think the words were, the most comprehensive --

23             MS. BENNETT:  Yes.

24             THE COURT:  -- set of parties?

25             MS. BENNETT:  Yes, we have them --

Colloquy                                          15

1              THE COURT:  (Indiscernible) --

2              MS. BENNETT:  -- but --

3              THE COURT:  -- (indiscernible) --

4              MS. BENNETT:  I'm sorry, Your Honor.

5    (Indiscernible) misunderstanding (indiscernible).

6              THE COURT:  So if I -- so if I have the -- if

7    I have the most comprehensive set of litigants in this

8    case, why should we send this case off to -- off to

9    South Carolina, where it appears that not all of the

10   defendant insurers will be parties to that case?

11             MS. BENNETT:  Understand the question.  So at

12   this time, Judge Gergel, between the two cases, has all

13   of the defendants -- insurance defendants that are in

14   this case, as well as in the two actions in South

15   Carolina.

16             So in other words, now all but two of the

17   insurance companies that are involved in this case are

18   in front of Judge Gergel, and BASF will have the

19   ability to add those two insurance companies that are

20   only in front of Your Honor, into the North Caroli --

21   I'm sorry, into the South Carolina case.

22             THE COURT:  So in the a -- because I've -- I

23   -- I read -- reading all of these briefs, the numbers

24   change, but I've -- I saw numbers of 7, and -- and

25   higher than that of parties that are not -- are not --

Colloquy                                      16

1   cou -- were not part of the South Carolina case.  As --

2   and as I understood it, could not be part.

3           But -- but you're telling me something

4   different.  Is it your -- is it -- is it your position

5   that one way or the other, all of the -- all of the

6   defendant insurers in the New Jersey action, will be

7   made part of the South Carolina case?

8           MS. BENNETT:  Yes.  We need to implead two

9   more defendants that are in this case, that are not yet

10  in a South Carolina action.

11          THE COURT:  Just tell me which -- which of

12  the two ca -- which two parties specifically would

13  require that -- that -- that treatment?

14          MS. BENNETT:  That would be Federal Insurance

15  Company and Greenwich Insurance Company.

16          THE COURT:  Okay.  Now one of the -- one of

17  the criticisms of what you're doing in dealing with New

18  York, ultimately South Carolina, New Jersey, is that

19  what you're -- all you're doing is engaged in a grand

20  forum shopping engagement.  Can you tell me why you

21  believe that's not the case?

22          MS. BENNETT:  We're not forum shopping

23  because we're centralizing this coverage dispute in

24  front of Judge Gergel, who has the AFF lawsuits, who

25  has our first filed lawsuit, who has two other

Colloquy                                17

1   insurance coverage actions that involve BASF, two

2   direct actions that were filed into the AFF MDL.

3          And so our objective has been to centralize

4   these -- this coverage dispute in front of the Judge

5   that has the underlying actions.  And then two other

6   insurance coverage actions that are already pending,

7   involving our coverage as well.

8          THE COURT:  All right.  So one of the -- one

9   of the issues that were -- was raised by the defendants

10  is that they are going to be prejudiced in some fashion

11  by being forced to litigate in South Carolina.

12         And that this is BA -- New Jersey is BASF's

13  home state.  And its -- all of its employees are here.

14  None of the -- none of the polices as well as the

15  defendants claim had anything to do with South

16  Carolina.

17         So why should -- we should South Carolina be

18  the home as it were to all of these cases, as opposed

19  to New Jersey?

20         MS. BENNETT:  Again, because Judge Gergel has

21  the underlying actions.  He has two other coverage

22  cases involving BASF, um, coverage matters.

23         We first filed here.  And in addition, Your

24  Honor, uh, London -- it's interesting that London takes

25  no position.  I'm not gonna deb -- get into my

1    argument, but I do want to note, uh, London filed in
2    New York.  And that was really why this got filed in
3    New Jersey.
4            So to limit it to the question to South
5    Carolina versus New Jersey, we also have to take into
6    account that there was the New York action that was
7    filed.
8            So they're not prejudiced by being in front
9    of Judge Gergel in South Carolina, because there's the
10   pending underlying MDL there.  There are two other, uh,
11   coverage actions, rel -- direct actions in implicating
12   BASF's coverage.  As well as our first filed action,
13   that is gonna move forward, um, you know, uh,
14   simultaneous.
15           There's a pending motion to dismiss there,
16   but we already know from what Judge Gergel did in Tyco,
17   that that first filed action is going to proceed, that
18   BASF filed.
19           THE COURT:  All right.  How many of the
20   insurance policies were drafted in South Carolina?  Or
21   was it -- this just a matter of Judge Gergel being in
22   South Carolina and that -- that is the -- that -- it
23   has nothing to do with -- with anything else other than
24   Judge Gergel having an expertise in these cases, and he
25   -- him being venued in South Carolina?

Colloquy                                      19

1          MS. BENNETT:  Well these policies were sold
2     to cover nationwide risk.  Um, including risk in South
3     Carolina.  All of these carriers do business in South
4     Carolina.
5          Um, and the cases got ven -- the MDL got
6     venued in South Carolina in front of Judge Gergel.  And
7     that's where we filed our first filed action.
8          THE COURT:  One of the ques -- one of the
9     statements raised by, I think at least two insurers, I
10    don't think it was more than two, maybe two.  It may
11    have just have been one and I just wrote it down wrong
12    -- was that any stay that I issue in this case, and of
13    course everyone from the de -- from the defense is
14    opposed to issuing a stay, at least the ones that I've
15    heard, and the -- and the party that's taken no
16    position, that any -- any stay should be limited until
17    the -- until the -- there is a remand of the New York
18    action, ba -- back to New York State court.  And I just
19    wanted to know your position as to that.
20         MS. BENNETT:  So our position is that the
21    stay should remain in place at least until Judge Gergel
22    rules on that remand motion.  There's also a
23    realignment motion pending before him in the now
24    transferred London action.
25         So there are a series of procedural motions,

1  uh, on Judge Gergel's desk.  Uh, and our -- and our

2  position is this action should be stayed until all of

3  those motions have been addressed.

4          THE COURT:  And how long -- I know you're not

5  a mind reader and you can -- you don't -- you don't

6  control Judge Gergel's calendar, but giving it --

7  giving it your best guestimate, how long do you think

8  that would last?

9          MS. BENNETT:  I really am not in a position

10 to answer that, Your Honor.  All of those motions are

11 fully briefed.  Um, but we've not been contacted by the

12 court with respect to oral argument, or when a decision

13 will come down from Judge Gergel.

14         THE COURT:  All right.  Thank you so much,

15 Ms. Bennett.  I do appreciate your answers.  And then

16 I'm gonna -- I'm going to ask, I guess, it would be Mr.

17 Calogero?  Is that the correct pronunciation of your

18 name, sir?

19         MR. CALOGERO:  Yes, Your Honor.

20         THE COURT:  All right.   Thank you so much.

21 And let me just ask you -- you a couple of questions.

22 Do you believe that -- that BA -- BASF is engaged in

23 forum shopping, and if so, why -- why do you take that

24 position?

25         MR. CALOGERO:  Well I -- it -- it is -- it is

1    forum shopping, um, because they want to get, uh,

2    before what they think is a judge who is gonna make

3    certain rulings for them.  Uh, that --

4              THE COURT:  Now let me just --

5              MR. CALOGERO:  -- South Carolina --

6              THE COURT:  Let me just stop you there.  Why

7    -- yeah, that was the theme running through all of the

8    defendants' papers.  But without any factual

9    statements.

10             I mean, basically -- and tell me if I'm wrong

11   -- I'm -- I'm -- I am more than happy if you tell me

12   I'm wrong, but that's the theme that I got.  And -- but

13   it was -- it wasn't supported by anything.  Why do you

14   believe that you can't get a fashe (sic) -- a fair

15   shake before --

16             MR. CALOGERO:  I -- I'm not --

17             THE COURT:  -- Judge Gergel in South

18   Carolina?

19             MR. CALOGERO:  I'm not saying we can't get a

20   fair shake in front of Judge Gergel.  What -- what I'm

21   saying is that this case will become one of thousands

22   of cases that Judge Gergel was handling on these

23   firefighting foam case.

24             Whereas it is a unique case involving

25   insurance coverage, and not the underlying issues

Colloquy                                          22

1    regarding the -- the quality of firefighting foam, and

2    what it did in the ground water.  Uh, it was -- it --

3    this -- these policies have already been litigated

4    twice in New Jersey.

5            And um, uh, one of which involved a chemical

6    that got into ground water, a -- a product.  And um,

7    the issue is that the first case that they filed, that

8    would not -- that would be an unfair case because it

9    doesn't have all of the insurance companies that are

10   involved in the coverage picture.

11           And because of that, uh, what you have is

12   coverage that's all over the place, and is missing

13   spaces, uh, in coverage.  And those parties would have

14   to be part of that, uh, South Carolina action that they

15   filed first.

16           Now we don't know what's gonna happen with

17   the London case.  It may very well be moved back out of

18   South Carolina and go back to (indiscernible).

19           There may be some procedural maneuvering that

20   would take a long time, and that would prejudice us in

21   the sense of, we cannot get started on any kind of

22   discovery while these procedural maneuverings are

23   taking place.

24           But I think -- I think that's the biggest

25   problem, is that the action that they originally filed

Colloquy                                          23

1   is totally incomplete, leaves out at least by our

2   count, about two hundred million dollars' worth of

3   coverage.

4            Now they claim that they don't need it, but

5   in -- in fact, they do need it, because many of those

6   policies that are missing are what are on the first

7   layer of coverage to which people like Allstate are

8   above.

9            And we need to know whether or not those

10  policies below us are gonna cover the claims.  So it

11  was filed as an incomplete action.

12           It was filed in haste simply to -- to -- to

13  see if it could get pushed into a huge gigantic MDL

14  where it has no place.  And that's the prejudice for

15  us.

16           THE COURT:  All right.  So -- so just so I

17  understand it, the -- is -- is it fair to say that the

18  -- that the -- your client and your colleagues who

19  support you, don't have an issue with Judge Gergel

20  handling the litigation, except for the fact that you

21  don't want to be part of a massive -- a massive

22  proceeding.

23           And you prefer to be in New Jersey, and be --

24  being treated under the complex business litigation

25  docket as basically as if one case, as opposed to

Colloquy                              24

1    thousands of cases?

2           MR. CALOGERO:  Yes, Your Honor.  Essentially

3    that.  And I -- I don't want to stray from your

4    questions, but can I point out to an example --

5           THE COURT:  Yeah.

6           MR. CALOGERO:  -- of something they have

7    cited in their brief?  They cite as an example of --

8    uh, of why they should in South Carolina, they cite

9    what they call the Tyco (indiscernible).

10          Now in the Tyco case, yes, there is a

11   (indiscernible) case in South Carolina that involves

12   coverage issues with a company called Tyco.  But at the

13   same time, there is also another coverage case, which

14   covers the same policy, that has been filed in State

15   court in Wisconsin.

16          And that case is a standalone case.  And in

17   that case, the Judge in Wisconsin has already issued

18   two or maybe three -- at least two rulings --

19   substantive rulings because he has the ability to

20   separate that case and concentrate on that case.

21          And he's already issued two rulings, and had

22   discovery going forward in that case.

23          Whereas in the ADL case -- in the MDL case,

24   there -- there haven't been those substantive rulings.

25   That -- that's an example of why I believe a State

Colloquy                                    25

1    court fully capable of handling these cases.  And it

2    should be a standalone coverage case, and not subsumed

3    within an MDL proceeding.

4         THE COURT:  Well I -- I can guarantee, I --

5    I'm not concerned about my ability to handle this case.

6    I've handled -- I have handled in the CBL docket cases

7    involving billions of dollars in insurance coverage.

8    So that's not really an issue.  I'm not, you know,

9    afraid of handling the case.

10        The concern is this case -- this -- this case

11   was stayed for certainly -- certainly a time.  And I

12   have the judicial panel on multi-district litigation,

13   who determines that Judge Gergel has -- has deter --

14   has determined that, or believed that it's more

15   appropriate for Judge Gergel to handle all of these

16   AFFF lawsuits.  Why should I disagree with the judicial

17   panel?

18        MR. CALOGERO:  Respectfully, Your Honor, the

19   panel --

20        THE COURT:  I -- I know I'm in trouble --

21   when I -- whenever I hear respectfully, I know I'm in

22   trouble.  When I hear most respectfully, I should -- I

23   feel that I should hide (indiscernible).

24        MR. CALOGERO:  I -- I haven't -- I haven't

25   gone to Def Con 5 yet, but um, the -- the -- that panel

Colloquy                                         26

1    only chose -- its decision, only chose that as between

2    the Southern District of New York, and the district of

3    South Carolina, that as of those two districts, the

4    district of South Carolina should hear the London case.

5           It didn't say anything about the ability or

6    non-ability of any other court in this country,

7    including Your Honor's court, to handle these cases.

8    That's -- that -- that was -- that was restricted

9    solely to that choice.

10          THE COURT:  You know that -- I -- I see the

11   -- one of the -- one of the persons on this -- on the

12   -- on the -- you -- on the panel on multi-district

13   litigation was a Madelyn Cox (indiscernible), who I

14   have a great deal of respect for.

15          Let me -- let me ask you a different ca --

16   let me di -- ask you a -- a different question.  One of

17   the que -- one of the questions that I would -- I

18   wanted Ms. Bennett with was, should I stay this action

19   until -- until Judge Gergel makes a -- makes a

20   determination as -- or whoever's gonna make a

21   determination in New York, as to -- or in -- anywhere

22   else, as to whether the case should be remanded back to

23   State court?

24          MR. CALOGERO:  Well that -- that was -- it

25   was an interesting question.  It's an interesting

Colloquy                                          27

1    question because their original motion was simply that,

2    that you -- you should stay this case until there is an

3    adjudication of the -- what they called the New York

4    action.  The London action.

5           However, when they filed their reply briefs,

6    and they filed the conclusion in that, they expanded it

7    and said they wanted, uh, this case stayed until

8    there's adjudi -- adjudication of both the first filed

9    action, which is their South Carolina action, and the

10   New York action.

11          So they -- they asked for something that was

12   broader in the reply brief than they asked for in the

13   original briefs.

14          But going back to your question, I -- I

15   believe that there are so many different ways that, uh,

16   the New York case can wind up, uh, uh, in terms of

17   whether it's gonna stay, whether it's gonna go back to

18   New York, whether it's gonna be realigned, whether

19   Judge -- they -- they've also -- BASF has also asked

20   for discovery from London on the -- the syndicates in

21   order for -- to determine, uh, whether there's

22   jurisdiction, uh, di -- whether there's diversity.

23          So there could even be a -- a finding that

24   there has to be discovery, which would only involve

25   London and not involve Allstate at all.

Colloquy                                          28

 1              So the -- the various situations or outcomes
 2    are such, and the way that the decision tree could be
 3    made, that just keeps this case stayed while all those
 4    things happen, I think would be a waste of judicial
 5    resources at this point.
 6              THE COURT:  Now --
 7              MR. CALOGERO:  But this case has everybody
 8    and it should proceed.
 9              THE COURT:  Now the -- the question bri --
10    bring -- another question that brings to my mid is,
11    this case was stayed for -- you know, I don't remember
12    exactly how long it was stayed, but I didn't hear boo
13    from anyone until -- until this motion.
14              Now everyone wants to start discovery and
15    everyone is very -- from the -- from the defense
16    perspective, everyone is concerned about not having the
17    case stayed, and not wasting time.
18              Tell me exactly what happened with -- with
19    the insurers?  And I gues you could only ask -- you can
20    answer for -- only answer for your client, that
21    everyone is now hot to trot on this -- on -- on moving
22    the case in New Jersey, when the case is -- was -- was
23    stayed for -- for a period of time?
24              MR. CALOGERO:  I -- I can only answer on
25    behalf of Allstate.

Colloquy                                    29

1           THE COURT:  I understand that.

2           MR. CALOGERO:  That -- Allstate -- Allstate

3    filed its answer a few weeks after it -- it was -- it

4    was served with the complaint.  We would never -- we

5    never signed that consent order, because we didn't --

6    we weren't asking for an extension of time, uh, for

7    this.

8           We -- we served our answer.  We also served,

9    uh, a request for production of documents named in the

10   -- uh, that were identified in the complaint.  Um, we

11   would have been ready to proceed with discovery, but

12   it's the complex rules that requires us to have a

13   conference, uh, and set forth an order.

14          So we've always been ready to proceed with

15   the case.  Uh, I -- so I can't speak to why other

16   people needed some time.

17          THE COURT:  Well let's just talk --

18          MR. CALOGERO:  And to (indiscernible).

19          THE COURT:  Let's just talk about Allstate

20   then.  You know, certainly one of the things that

21   everyone who appears before me, and -- and generally

22   they're of -- of the highest quality firms throughout

23   the ent -- throughout the nation -- one of the things

24   they all share is they are not shy.

25          So I get -- I get letters in the docket all

1   the time about, they want to move a case, or the -- the

2   reason that they don't want to move a case, because

3   there's -- because there's no requirements of a motion

4   -- of -- of a motion that we -- we -- we discourage

5   that if something can be dealt within a single letter.

6          So Allstate, as best as I can tell, never

7   wrote me a letter and said, what is going on?  We want

8   to proceed with this case as soon as possible.  But --

9   and -- and instead the -- the case was -- the case was

10  stayed, and nobody did any -- nobody did anything, at

11  least from -- from Allstate's perspective.

12         I'm not accusing you of not doing anything,

13  but you know, I'm -- I'm -- I find myself sort of as a

14  -- as a wheel -- a small wheel in this giant -- giant

15  machine, in all of these cases with all of these

16  insurers.

17         And my goal is obviously to ensure that

18  justice prevails, and that -- that we do not waste

19  judicial resources.

20         And at the same -- and at the same time, if

21  there is a -- if there is a judge who is a -- well-

22  versed in handling all of these cases, and no one is

23  going to be prejudiced, why wouldn't we allow -- or why

24  wouldn't I allow that judge to -- to deal with this

25  case, at least temporarily.

Colloquy                                          31

1              Because what was -- what I was initially

2      thinking of before actually I read one of the -- one of

3      your colleague's comments about -- about staying it

4      temporarily -- I don't think they used that word, but I

5      -- I interpreted it as -- as whether it -- you know

6      three mon -- you know a three month stay, or something

7      like that, to see if -- what -- what goes on with the

8      remainder of this case and things that I do not

9      control.

10             So I just wanted to get your thoughts on some

11     of my -- my probably convoluted thoughts and questions

12     that -- that I directed to Allstate.

13             MR. CALOGERO:  Yeah, the only thing I can

14     say, Your Honor, is that if this was not -- there was

15     -- there were people who had not answered yet.  There

16     were also defendants who had not been served yet by

17     BASF.

18             And the -- the complex business -- the

19     business rules really require that before they --

20     discovery was gonna go forth, there had to -- everybody

21     had to be in the case.

22             And um, everything else -- if I had served

23     discovery, they wouldn't have even had to answer it

24     until we had a conference.

25             If this had not been one of the complex -- if

1    this had not been within the complex rules, I could

2    have served all the discovery I wanted with my answer,

3    and they would have had to answer it.  Uh, because I

4    had fi -- I -- I had my answer on file.

5           But that's in some ways, we -- we had to

6    proceed along the business rules, which required that

7    everybody had to answer, and that -- that meant that

8    everybody had to be served.  And that hadn't happened

9    yet.  So I -- that was the reason why we did not go

10   forward.

11          THE COURT:  No, I understand that, but I

12   guess my -- my only comment is that there was never --

13   no one on behalf of Allstate communicated with me and

14   described a problem, and -- and said, we really want to

15   get this case moving.

16          Which I get -- I get these case -- I get

17   these type of letters many times.  And then I had a

18   conference and we -- we figure out what's the holdup.

19   We -- we deal with it.

20          And the case starts to move.  But in any

21   event -- and it's your view, counsel, that -- that if I

22   stay this case for a sho -- a relatively short period

23   of time, meaning something like 3 months -- and I don't

24   know -- I haven't the faintest idea what -- what Judge

25   Gergel's calendar looks like.

Colloquy                                        33

1          I'm sure it's -- it is, with all of these

2    cases, very voluminous.  But I don't want to redo the

3    wheel if -- if it can be avoided.

4          By the same ti -- by the same -- by the same

5    thought process, I don't want to waste time.  Because

6    that's -- you know that's why we had some time -- some

7    of our cases linger around while we're waiting for

8    procedural things to happen in other states.

9          And you know, I have no control over that one

10   way or the other.  So just tell me if -- if you -- if

11   you believe -- and then I'm gonna -- then I'm gonna let

12   Ms. Bennett and you, you know, present your full

13   arguments without me interrupting.

14         But tell me if I would -- if I did -- if I

15   granted -- granted BASF's request for a -- a shorter --

16   a short -- probably a shorter stay than they want, like

17   a 3 month stay, would that prejudice Allstate?

18         MR. CALOGERO:  Well I -- I think at least

19   from Allstate's perspective, it -- it would, because we

20   can't -- we can't do any discovery here.  We can't have

21   the dis -- our -- our compliance conference.

22         And there are too many unknown variables with

23   what could potentially happen with -- I'm gonna -- I'm

24   gonna only refer now to the London case -- but there

25   are other issues that -- that are out there with the

1  first filed action by BAS (sic).

2         There are too many variables to -- to stay

3  the case for 3 months while there could be a whole

4  bunch of factors that lead that case to continue on to

5  -- to not getting anything -- any of those motions

6  resolved.  So I -- I think there would be a prejudice.

7         THE COURT:  All right.  One of the questions

8  I asked Ms. Bennett, and -- and her answer was that if

9  the case would proceed in -- in South Carolina, the --

10 through -- through impleader, ev -- all of the insurers

11 would ultimately be party to that case.  Do you agree

12 with Ms. Bennett's analysis?

13        MR. CALOGERO:  Um, I think when -- I think it

14 -- I think it's true that if you take her first filed

15 action, and you take the London action, and you combine

16 them together, that you will arrive at -- what -- the

17 number she has two or three people.

18        Um, when I originally filed my opposition

19 brief, I was only comparing the London action to the

20 New Jersey action.  And there was seven people.

21        So, if you put her two actions together -- if

22 you put those two actions together, there probably are

23 only two or three people that are missing.

24        THE COURT:  Okay.  What I'd like to do now,

25 as I typically do, Ms. Bennett, I'm gonna ask you to --

Colloquy                                    35

1   to you know, state your argument as you see fit.

2   Noting that I've read everything.

3          But feel free to -- to say whatever you want.

4   I don't want to cut you off.  I want you to feel free

5   to say whatever it is that you think is appropriate.

6   Respond to any of the comments that I asked Mr.

7   Calogero.

8          Hopefully I'm mis -- pronouncing that name

9   properly.  If not, I apologize.  And -- and then I may

10  interrupt -- I may interrupt you, or I may just listen

11  to what you have to say.  And then we'll go forward.

12  Okay, Ms. Bennett?

13         MS. BENNETT:  I appreciate that, Your Honor.

14  And I appreciate that you read everything.  So I'm not

15  going to give you an outline of repeating everything.

16         Uh, and I'm also gonna take advantage of, uh,

17  Mr. Dashiel passing me, uh, a virtual note to make sure

18  that I correct or clarify, um, the first question that

19  you asked me about the cases in the stay.

20         We did provide Your Honor with two cases in

21  our papers that specifically address the Court having

22  discretion, uh, to stay an action filed by the

23  plaintiff.

24         And that's the Ikona Opportunity (phonetic)

25  case.  And the Halperin v. Verizon (phonetic).  But

Bennett - Argument                                    36

1    those are both in the briefs.  Um, so apologize for

2    that, and I appreciate Craig keeping me, uh, on -- on

3    point here.

4           Um, with respect to our position, um, as we

5    did set forth in the papers, all the action here is in

6    South Carolina.  The AFFF MDL is pending there.  Judge

7    Gergel has that.  Judge Gergel has our first filed

8    action.

9           Um, now through the JPML, he has the, uh,

10   London action that was filed in New York.  Um, and uh,

11   Mr. Calogero tried to, um, characterize what the JPML

12   did, as making a decision as to whether the district of

13   New York was better than the districts of South

14   Carolina, that's not really reflective of what the JPML

15   did.

16          What the JPML said was, quote, moving that

17   London action would, quote, benefit from the inclusion

18   in the centralized proceedings, closed quote, in South

19   Carolina.  And that maintaining the coverage actions in

20   the MDA -- MDL will, quote, promote the justice and

21   efficient conduct of the litigation.

22          So the MDL, uh, or the whole purpose of MDL

23   is to centralize proceedings like this for the sake of

24   efficiency, because there's gonna be a lot of overlap

25   in the discovery that takes place in the underlying

Bennett - Argument                              37

1    MDL, that will then relate to, um, the coverage actions

2    that are now pending before Judge Gergel.

3            So it's not really accurate to say that it

4    was a choice between New York or South Carolina, which

5    district was better.  What the JPML did was reinforce

6    the whole purpose of what an MDL is, which is to

7    promote, um, judicial efficiencies by having all these

8    related matters centralized in front of one judge.  Uh,

9    --

10           THE COURT:  Well, I've read -- I read the --

11   you know I have the -- I have -- I've read twice the

12   brief on the -- the MDL transfer order.  And it seemed

13   it was a very positive recommendation or order as to

14   why -- why what you want should occ -- should occur.

15           And I really di -- I also noted that it --

16   that as best as I could tell, unless I missed

17   something, the -- none of the defendant insurers who

18   wrote -- wrote papers to me really commented on it,

19   whether it's correct, incorrect, they just sort of

20   ignored it.  But in any event, Ms. Bennett, you may

21   proceed, thank you.

22           MS. BENNETT:  Thank you, Your Honor.  The

23   other comment that I just wanted to -- and I'm -- I

24   want to try to limit my comments more to just, uh,

25   addressing a little bit what Mr. Calogero, uh, talked

Bennett - Argument                                    38

1   about in your questions to him.

2            And this whole notion of being prejudiced and

3   that the carriers are really interested in getting this

4   case moving, um, really doesn't ring true when you look

5   at what's happening in South Carolina.

6            Because we've been trying to get the coverage

7   case moving in South Carolina.  They moved to dismiss

8   our first filed action.

9            They opposed the efforts to get the Lon --

10  the -- the preemptive strike lawsuit that London filed

11  moved into the MDL.  That failed.

12           We've asked Judge Gergel -- we submitted a

13  scheduling order to get moving, get discovery moving in

14  that case, and the carriers objected to that.

15           So we really should all just be kind of

16  upfront and honest about what's going on.  Which is

17  we're still battling which forum is the best forum of

18  this case to proceed.

19           And the reality is that Judge Gergel and the

20  JPML have both very clearly determined that South

21  Carolina is the right place for coverage actions

22  relating to the AFFF MDL.

23           That's where it should be.  But if the

24  carriers are really interested in getting moving on

25  discovery, and getting this coverage dispute moving

Bennett - Argument                              39

1    forward, they can stop erecting roadblocks in South

2    Carolina.

3           Um, because we did submit a scheduling order

4    to get discovery moving in that case, and the carriers

5    objected.  Um, so from our point of view, if the

6    carriers are really interested in getting moving, we

7    can get moving in South Carolina.  We can start taking

8    discovery in South Carolina.

9           And they -- if they're really concerned about

10   that, they can withdraw their objections there.

11   There's not -- uh, there's no reason to start it here.

12   Um, --

13          THE COURT:  Let me ask you a question.  And

14   I'm gonna ask you to read the mind of the insurers, or

15   perhaps you already know the answer.  Why -- why do you

16   believe that the -- the insurers which -- would --

17   would much prefer to have me, a -- a judge who had

18   never handled an AFFF case, handle this one, as opposed

19   to a judge who is thoroughly conversant and familiar

20   with those actions?

21          MS. BENNETT:  Well --

22          THE COURT:  And you -- and you can be

23   perfectly honest.  Be perfectly honest.  You -- you

24   said, in fact, you -- you think everyone should be

25   upfront.  So tell me why?

Bennett - Argument                                            40

1          MS. BENNETT:  I will be very upfront.  I

2    think they don't -- uh, they don't like the rulings

3    that Judge Gergel has made in the Tyco case.  Because

4    he's clearly messaging the importance of having

5    insurance coverage available to address and resolve the

6    underlying actions.  I think that that's why they don't

7    want to be there.

8          And frankly, our interest is to get those

9    cases defended and resolved efficiently.  Which is why

10   we believe the coverage actions should be addressed by

11   Judge Gergel.

12         But I think that that's what it is.  That

13   they're concerned his rulings will be, um, favorable to

14   -- to making insurance coverage available to resolve

15   these AFFF lawsuits.

16         THE COURT:  All right.  Then you can

17   continue.  I didn't mean to interrupt you.

18         MS. BENNETT:  No, I -- I appreciate it, Your

19   Honor.  Um, I'd like to reserve a couple of minutes for

20   rebuttal, but I'll -- I'll just end with, Judge Gergel,

21   JPML have sent a very strong message that the interest

22   of judicial economy and conservation of the parties

23   resources will be best served by having this coverage

24   action proceed in South Carolina.

25         Um, that's where BASF believes this coverage

Bennett - Argument                                41

1    action should proceed.  Um, and we would respectfully

2    request that you stay this action at least until Judge

3    Gergel rules on all of these gating, um, procedural

4    motions that are pending before him.

5              Because it -- it will result in tremendous

6    waste of judicial resources if we're, uh, litigating in

7    two jurisdictions at the same time.  Thank you.

8              THE COURT:  All right.  Thank you, Ms.

9    Bennett.  And by the way, Ms. Bennett, I think I was a

10   little too harsh with you in the beginning of this, so

11   I do apologize -- apologize for that.

12             MS. BENNETT:  I -- I just appreciated --

13             THE COURT:  (Indiscernible) --

14             MS. BENNETT:  -- you didn't call me Mr.

15   Trump, but other than that, we were -- it's all good.

16             THE COURT:  No, I just didn't want this to

17   turn into a -- into a political debate where everyone

18   just sort of said what they want to say without regard

19   to the question.

20             With that said, Ms. -- Mr. Calogero -- and

21   then I'm gonna turn to whoev -- anyone else who wants

22   to speak.

23             But Mr. Calogero, feel free to respond to

24   anything that Ms. Bennett said, or anything that you

25   want to say.  And then I'll turn it over to everyone

1   else.

2              MR. CALOGERO:  Yeah.  First -- first, Your

3   Honor, thank you, Your Honor, (indiscernible) Calogero,

4   Allstate.  First of all, the -- the two cases that were

5   cited at the beginning of Ms. Bennett's, uh, statement,

6   the Ikona (phonetic) case and (indiscernible) case,

7   they -- they don't aid anything here, because in both

8   of those cases, the issue was that the plaintiff was

9   seeking a stay solely because the -- the sole issue

10  that was before those courts was going to be determined

11  by an Appellate Court.

12             And that Appellate Court decision was going

13  to in effect be the ruling in those cases.  That --

14  that's not the situation.  The -- so those cases really

15  have no application.

16             Uh, quite frankly, I've never seen a case

17  where, uh, a plaintiff has filed an action,

18  legitimately with proper venue and jurisdiction, in a

19  State court and then has sought a stay.

20             It just doesn't happen, and -- and the -- the

21  cases that, uh, we have been citing in our -- both

22  sides have -- have been citing in briefs, the Sensient

23  case and uh, the -- the case that was cited, the

24  Century v. Safety Mine case.

25             Those were cases where they were races to the

Calogero - Argument                                    43

1    courthouse, uh, where the -- either the insured filed
2    first, or the insurer filed first and then the insured.
3    Here we have a situation where it's -- it was -- it's
4    almost like a serial filing.
5            Uh, where they -- they filed a case in South
6    Carolina, then they filed the case in New Jersey, and
7    said -- said in their that the (indiscernible) -- this
8    is a complete case, it names all the parties.
9            It -- it obeys all the rules of -- of court.
10   They have a presence here.  And they simply used it as
11   a -- as a poker chip so that they could leverage
12   themselves to South Carolina.
13           That -- that's what -- that's what's done
14   here.  There's nothing wrong with proceeding with this
15   case in New Jersey.  Uh, there have been two cases on
16   these very same policies in New Jersey courts.  One in
17   -- and both of them were in Union County.  One was an
18   environmental case, and one was a products case.
19           The polices themselves are New Yor based
20   policies.  They're called 10502 policies.  The reason
21   being that Cepagogi (phonetic) was based in Ardsley,
22   New York.   And 10502 happens to be the zip code of
23   Ardsley, New York.
24           So -- and -- and they -- they cite New York
25   law.  So there's nothing special about having it in

Calogero - Argument                                    44

1    South Carolina.  And -- and I think that the real issue

2    here is, is there something special about having the

3    underlying cases -- the firefighting foam cases, that

4    needs to be addressed in the coverage case.

5           And the coverage case has totally different

6    issues.  Issues of allocation, issues of policy

7    interpretation that have nothing to do with firefight

8    -- uh, the foam cases, and the science of foam cases.

9           Um, in -- in Westing -- in the Westinghouse

10   case, uh, in -- going back to 1989, Judge Cressler said

11   two things that I think are important here.

12          First, that fractalization is a dangerous

13   weapon that can be used by a party to, uh, get what it

14   wants where it couldn't otherwise get something.

15          Uh, and that's what happened in the

16   Westinghouse case, where they tried to send the cases

17   all over the country.  That was one of the rulings.

18          The second ruling was -- was -- and Judge --

19   Ju -- and we cited her, uh, at length in our brief,

20   which is that New Jersey courts are capable of handling

21   complex litigation.

22          And they -- they availed themselves of -- of

23   the New Jersey court simply to take advantage

24   procedurally.

25          They feel -- they felt that they had some

Calogero - Argument                                45

1    benefit, that this was gonna be some kind of ace in the

2    hole in case everything fell apart in South Carolina.

3    And that's not the way that litigation should be filed.

4         THE COURT:  Well let me just in -- let me

5    just interrupt you for a moment.  How do you respond to

6    what the judicial panel on multi-district litigation

7    did, which I thought was a very strong order regarding

8    -- regarding avoiding -- of -- of -- regarding

9    centralizing these -- centralizing these disputes and

10   centralizing these -- these cases.

11        So I'll just -- I'd like to hear your

12   thoughts, because it wasn't addressed in -- I don't

13   believe, in your brief or in any other of the insurers

14   briefs.

15        MR. CALOGERO:  Well, as I said, my -- my

16   answer simply is that was a decision that was made as

17   between whether the Southern District of New York

18   should have the case, or -- or South Carolina and the

19   MDL should have a case.

20        They also -- there's also reference to those

21   two third-party actions, uh, --

22        THE COURT:  Well I think the -- I think

23   having read that transfer order (indiscernible), maybe

24   you disagree, but I think it goes a little bit farther

25   than that.

1          I think it was much more of a comprehensive

2    order, and talking about the benefits of why they

3    should be -- at least the -- the cases referenced in --

4    in that order, should continue to be in South Carolina.

5    You can dis -- you can disagree with me, but that's --

6          MR. CALOGERO:  Well I -- I --

7          THE COURT:  -- how I read it.

8          MR. CALOGERO:  I don't read that way.  And --

9    and again, I again point to the -- to the fact that --

10   um, that in the Tyco case, uh, there's -- there is out

11   there in State court in Wisconsin, that is proceeding,

12   uh, on its own.  Uh, despite the fact that, uh, there's

13   a Tyco MDL case.

14         So it's not necessarily the case that that --

15   you know it has to be a case, uh, in South Carolina.

16   It can be a case in another State court.

17         THE COURT:  Yeah, and I -- you know I -- I

18   assure you, I'm fully competent to handle the case.

19   The question is, does it make -- does it make -- and

20   it's also discretionary as to what I do -- the question

21   is, under -- under -- under the -- under the case law,

22   whether it makes sense for me to handle -- handle this

23   case.

24         Or as -- as I'm looking at it right now, the

25   -- the choices that I'm thinking of are -- are B, to

1  grant a sh -- a relatively short stay sort -- you know,

2  in the -- in the three to six month range, so that we

3  can have a better handle of what is going on in --

4  throughout the country.

5          And you know, particularly with -- with Judge

6  Gergel's calendar.  And some of these issues may have

7  been resolved.  I don't want to -- I don't want to be

8  involved in a situation where I'm issuing rulings that

9  contradict whatever is going on in South Carolina.

10          And that is a recipe for disaster, as I -- as

11  I see it.  But anyway, I interrupted you probably for

12  the third time or the fifth time or the tenth time.

13  But I want you to continue, then I'm gonna turn it over

14  back to --

15          MR. CALOGERO:  Well I --

16          THE COURT:  -- whoever -- whoever else wants

17  to speak.

18          MR. CALOGERO:  I -- I think I've -- I think

19  I've said -- uh, I've said it all.  Uh, and the rest of

20  it's in the brief.  So I'll defer to my colleagues if

21  anyone wants to step up.

22          THE COURT:  All right.  Any of the other

23  counsel for the insurers who would like to -- who would

24  like to be heard?

25          MR. LORENZO:  Your Honor, Alex Lorenzo from

Lorenzo - Argument                                    48

1    Alston & Bird.  Uh, Mr. -- Mr. Beyer had introduced us.

2    Um, he's our New Jersey counsel at Riker.  And we

3    represent the AIG insurers.

4           I thought it might be helpful, Your Honor,

5    there's been a lot of mention about the Tyco

6    litigation.  And we were directly involved on behalf of

7    the AIG insurers, in both the Wisconsin litigation and

8    the South Carolina litigation.

9           Just a couple of points, because Your Honor

10   has raised this concern about creating chaos.  I -- I

11   think was Your Honor's words, right?  With -- with

12   intersecting rulings.

13          In fact, as Mr. Calogero had indicated, there

14   were multiple decisions in Wisconsin ahead of decisions

15   in South Carolina.

16          And in fact, having the Wisconsin case was

17   where both, not only the insurers, but also Tyco, who's

18   represented by Covington obviously, a national

19   insurance recover counsel, filed motions in the

20   Wisconsin court, and litigated issues in Wisconsin,

21   even though the South Carolina action was pending.

22          So there was benefit to having a court, as

23   Your Honor had mentioned, who could focus directly on,

24   you know, the -- the insurance issues, while the larger

25   MDL was pending.

Lorenzo - Argument                          49

1          And -- and to that point, uh, and I don't
2    think it's in the briefs, but um, Ms. Bennette made
3    reference to the fact that they've been trying to get a
4    schedule in South Carolina.

5          And in fact, BASF went to the Court very
6    early on before, um, the other parties had even
7    appeared, uh, and tried to get their case on the Tyco
8    schedule.

9          And I have a transcript in front of me from
10   an April 25th, uh, MDL conference, where this issue --
11   uh, this expedited schedule was raised before Judge
12   Gergel.  Um, and I'm looking at page --

13               THE COURT:  Has that --

14               MR. LORENZO:  -- 38, and we can --

15               THE COURT:  Has that --

16               MR. LORENZO:  -- certainly submit this.

17               THE COURT:  Yeah, has that been submitted?
18   If -- if it hasn't been submitted, I'm just gonna
19   respectfully ask you not to -- not to discuss it,
20   because the other parties haven't had an opportunity to
21   review it.

22          And I haven't had an opportunity to read it.
23   If you -- if -- if you -- if somehow I missed it, let
24   me know, but I don't think I did.

25               MR. LORENZO:  I -- I don't think it's been

Lorenzo - Argument                              50

1   submitted.  But needless to say, Judge Gergel didn't

2   put the BASF case on the Tyco schedule, right?

3           And so certainly in the -- in the Tyco

4   situation, discovery -- an agreement was reached to

5   have discovery apply to both cases.

6   So to Your Honor's question of should we just stay this

7   case for three or four months, well both the motion to

8   dismiss, the motion to realignment, and we learned for

9   the first time that BASF intends to implead defendants

10  who aren't currently in South Caroline, while all those

11  issues get worked out.

12          It certainly makes sense that we could get

13  discovery going in this case.  And to the extent that

14  things happen, right, the South Carolina cases could be

15  brought in.

16          But there's -- there's really no reason that

17  we see in a case where BASF has invoked the

18  jurisdiction of this Court and filed an action -- a

19  comprehensive action before Your Honor, that we can't

20  go forward here.

21          THE COURT:  All right.  Ms. Bennett, can you

22  respond to that?

23          MS. BENNETT:  Yes, Your Honor.  You -- you

24  were already on the path of where I was gonna go to

25  respond to that type of issue.  Which is, when Judge

Bennett - Argument

51

1   Gergel rules on the pending motions, the jurisdictional
2   motions that are there, this is lining up to have all
3   of the insurers in front of Judge Gergel, between the
4   two coverage actions that are filed there.
5           And then you and Judge Gergel getting issues
6   at the same time, setting up for inconsistent results
7   -- inconsistent decisions and outcomes in those two
8   cases.
9           So again, our position is, at the very least,
10  Your Honor should -- should stay this action until we
11  know whether the carriers are gonna be able to
12  successfully navigate their way out of South Carolina.
13  That's where all these cases are pending now.
14          Um, and if and when Judge Gergel keeps all of
15  those cases, he's gonna have the whole coverage case.
16  And there's not a reason to have two, uh, courts
17  dealing with the same issues at the same time.
18          It's not an efficient use of judicial
19  resources.  And it also sets up for the possibility of
20  inconsistent results.
21          Those are all the reasons that the JPML
22  referred -- uh, or transferred the case from New York
23  to South Carolina.  For that exact reason, to avoid
24  exactly those issues.
25          THE COURT:  All right, thank you, Ms.

Lorenzo - Argument                                    52

1   Bennett.  All right counsel, were you done with your

2   remarks?  I don't want to cut you off.

3               MR. LORENZO:  Uh, I was, unless -- unless

4   Your Honor has any -- any additional questions.  I -- I

5   will say, Your Honor, I mean -- and I think Mr.

6   Calogero touched on this -- but this is unprecedented

7   to have the plaintiff, who invoked the Court's

8   jurisdiction, argue that a different judge is actually

9   a -- a better forum, uh, to proceed under.

10              These arguments would be much more compelling

11  if it -- if this was another action brought by another

12  insurer.  But the situation we have here, there really

13  is no case law indicating that a plaintiff that

14  commences suit in this forum, names a comprehensive

15  list of insurers, and the insurers are prepared to go

16  forward, for some reason that we should then wait for

17  -- for another court to decide whether to proceed.

18              THE COURT:  Well I don't think that Ms.

19  Bennett is -- is making it up and it -- and it's not a

20  situation where there's one case in -- in South

21  Carolina, and we have one particular judge that -- that

22  you know, Ms. Bennett has -- has litigated before, and

23  -- and is familiar with.

24              We are -- we're dealing with a totally

25  different -- a totally different situation.  And -- and

Lorenzo - Argument                                    53

1    if this is a case of first impression, then it -- then

2    it's a case of first impression.  It will not be the

3    first one that I've -- that I've dealt with.

4         What I'm -- what I'm most interested in is

5    providing a mech -- providing a -- providing a

6    mechanism to deal with this case, that makes sense, and

7    avoids inconsistent results, while at the same time

8    protecting the rights of the defendants, and not -- and

9    get into a situation where they want to litigate this

10   case, they're ready to litigate this case, and it's --

11   it's sitting around because Judge Gergel is -- is you

12   know buried under a million cases, and nothing gets --

13   and nothing gets done.

14        So those are -- those are my concerns.  So in

15   any event, let's -- let's -- let me open up the forum

16   to get anyone else who wants to -- to -- to say

17   anything?  Counsel?

18        MS. BENNETT:  Your Honor, I'd like a moment

19   to reply but I don't want to jump in front of any other

20   carriers.

21        THE COURT:  Well (indiscernible) --

22        MS. BENNETT:  If they wanted to --

23        THE COURT:  (Indiscernible) --

24        MS. BENNETT:  -- comment first.

25        THE COURT:  Yes, Ms. Bennett.  Does any of

Bennett - Argument

54

1    the defendants' counsel want to say anything in

2    addition to what we've heard?  I'll take that as a no.

3    So Ms. Bennett, the floor is yours.

4            MS. BENNETT:  Thank you, Your Honor.  I'll be

5    brief.  I just want to address two issues.  Uh, the

6    first is Mr. Calogero's made reference a couple of

7    times to two other coverage cases involving this

8    insurance program, um, being litigated in New Jersey.

9            I just want to make clear for Your Honor,

10   neither one of those were MDL cases.  This is a totally

11   different situation because those were not, uh, MDL

12   cases, so that prior history is really irrelevant to

13   what we're talking about here.

14           Um, and then second, this idea that our

15   request for relief is unprecedented is simply not true.

16   And the reason I keep referring Your Honor back to

17   Sensient Colors and Mine Safety is when -- that's the

18   New Jersey Supreme Court twice speaking on these

19   issues.

20           And the upshot of both of those cases is that

21   the true plaintiff, the policyholder, should have the

22   right to litigate their insurance coverage dispute in

23   the jurisdiction of their choosing.

24           And we have made clear from the day we filed

25   the complaint in this action and in every other

Bennett - Argument

55

1   communication that we've put in front of any other
2   tribunal, that we believe this insurance case belongs
3   in South Carolina.

4          In the event that a court disagrees with us,
5   then we would prefer to be here.  We've -- we're not --
6   we -- we've been very transparent with every court,
7   every step of the way.

8          And Sensient Colors and Mine Safety couldn't
9   be clearer in communicating the public policy that the
10  true plaintiff, the policyholder, should be permitted
11  to litigate their coverage case in the jurisdiction of
12  their choosing.

13         And that's really what -- what we're striving
14  to do right now through this request for stay.  Because
15  in the event that Judge Gergel keeps all of these
16  cases, um, our chosen jurisdiction of South Carolina is
17  where this case will be litigated.

18         Um, and finally, the issue of Judge Gergel
19  not moving on this quickly because he's got a lot of
20  other cases, again respectfully Your Honor, the JPML
21  has addressed these issues, these considerations, um,
22  and issued as you've noted, a very comprehensive, uh,
23  order on what it thinks needs to be done to effectively
24  manage the AFFF MDL, and the insurance coverage issues
25  that grow out of that.  Um, and so with that, Your

Bennett - Argument

1    Honor, again we would respectfully request that you

2    enter the stay.  And we very much appreciate your time

3    and your, uh, thoughtful questions today.

4            THE COURT:  Well, one of the -- one of the --

5    one of the things that I -- I think I've -- I've made

6    clear was my concern -- at least -- at least to -- to

7    all of you, that -- that the -- the rights of the -- of

8    the insurance -- of the insurers have to be respected.

9            And what I don't want to happen, and I won't

10   permit to happen in this -- in this case, which is

11   pending -- currently pending before me, though --

12   though stayed, is that for whatever reason, this case

13   gets buried in South Carolina through no fault of Judge

14   Gergel, who I'm sure is doing a wonderful job down

15   there, but -- and then nothing -- nothing happens.

16   It's -- he's just buried through no fault of his own,

17   in all of these -- all of these cases.

18           So what I was thinking -- what I was

19   considering really at the beginning of this argument,

20   after I had read everything, was issuing a -- you know,

21   a stay of somewhere between three and six months to let

22   everything sort out.

23           And we can find out where -- where things are

24   going.  What if you're -- I may have asked you this,

25   but now that you've heard everything, I wanted to get

Decision                                                    57

1    your view of that.

2            MS. BENNETT:  Again, Your Honor, our -- a

3    stay of three to six months is acceptable to us,

4    provided that Judge Gergel rules, and we're happy to,

5    um, make contact with him to see if we can prod that

6    along.  Um, but that --

7            THE COURT:  (Indiscernible) --

8            MS. BENNETT:  -- that's our position.

9            THE COURT:  All right.  You know, that's --

10   you know I -- as -- as Ms. Bennett was speaking, and as

11   all of you were speaking, I was -- I had Sensient's

12   right -- right in front of me.  And let me just read a

13   little from that case, which I'm sure each of you have

14   memorized.

15           The -- and this is from Sensient and the note

16   -- I'm not gonna read -- read from the case.  But the

17   no -- the notion is that you have to consider the first

18   filed doctrine.  And you have to consider a host of

19   other things.  But it's ultimately my discretion as to

20   what -- what to happen with -- with this particular

21   case.

22           And when I go into -- looking at -- looking

23   at this case, and after considering the excellent

24   briefs written -- written in this matter, and hearing

25   the excellent arguments of counsel, you know, I'm deal

1  -- I'm dealing with the -- the fact that Judge Gergel

2  is handling a whole slew of these cases.

3          We have the transfer order from the United

4  States Judicial Panel on multi-district litigation.

5  Recognizing that that is the appropriate way to handle

6  these cases.

7          And my idea, and I think it was supported by

8  at least one or two of the other insurers -- one of --

9  one of the of the other insurers, was that it should

10  not be a stay of -- of a -- about -- without an end

11  date, because of the concerns that this could -- could

12  just go on and on and on in South Carolina without --

13  without anything happening.

14          What I'm going to do is I'm going to -- I'm

15  going to issue -- I'm gonna stay this case for four

16  months.  At that point, we're gonna -- we're gonna

17  schedule a case management conference.  We'll do it by

18  Zoom.

19          Samantha, do you have a -- can you give me a

20  -- a date sometime in -- hopefully not Christmas Day,

21  but sometime in -- so October, November, December --

22  actually, it'll be in January.  Sometime in Jan -- like

23  in the middle of January on a CBL date.  Samantha, are

24  you there?  Well --

25          Cc:  Samantha's not there, but I will, uh,

1    make sure that she, um, --

2              THE COURT:  Do you have the abil -- do you

3    have the ability to give me a CBL date, which would be

4    -- or any -- really any counsel, we can pick a -- any

5    -- any New Jersey counsel who has a motion calendar for

6    -- can give me a non-motion -- a non-motion date in

7    January.  So if you could look -- if you could -- if

8    any of you could do that.  I just don't have

9    (indiscernible) --

10             MR. CALOGERO:  Yes, Judge.  Give -- Steve

11   Calogero.  Give us a minute, we'll get that calendar.

12             THE COURT:  Sure.  So -- so that's -- that's

13   what we'll do.  And --

14             MR. CALOGERO:  Our calendar ends in December,

15   sorry.

16             THE COURT:  Yeah, well I tell -- I will tell

17   you what -- what we'll do.  We will -- we'll -- I'm

18   gonna ask -- I'm gonna ask Ms. Bennett, since she is

19   probably the major recipient of this, could you prepare

20   an order for me and just basically grant the stay until

21   the -- you know the -- through -- through January.

22             And -- through -- through the middle of

23   January.  And basically it would be the sec -- a non-

24   motion Friday in January.  Whatever that -- whatever

25   that is.

1           MS. BENNETT:  Sure.

2           THE COURT:  Okay.  All right?

3           MS. BENNETT:  Yes.

4           THE COURT:  And -- and --

5           COURT CLERK:  Your Honor, uh, I -- I have the

6    motion calendar up.  It looks like January 3, January

7    17, and January --

8           THE COURT:  Do you --

9           COURT CLERK:  (Indiscernible) are the motion

10   days.

11          THE COURT:  All right.  So it would be

12   January 10th.  Because that -- that would be the CBL

13   motion calendar.  And what we're gonna do, we're just

14   going to have -- we're going to have a case management

15   conference during -- on that date by Zoom.

16          And -- and the stay will -- will be in place

17   subject to anyone filing an appeal to the Appellate

18   Division.

19          But that's -- that's what I'm -- what I think

20   should happen.  As has been pointed out to me, there is

21   -- there is real chance of inconsistent results of --

22   and -- and that is the last thing that should happen in

23   -- in these -- in these cases.

24          I have no problem with handling this case or

25   any case.  This has nothing to do with my reluctance to

Colloquy                                          61

1    handle this case, and send it off to South Carolina

2    because I don't want to do it.  It -- it is everything

3    to do with, I don't want to have inconsistent results.

4    And I want to see what happens with the -- with the New

5    York case, and -- and what -- what -- other Judge

6    Gergel rulings.

7              Again, to the extent that those rulings don't

8    happen, and there is -- there is consider -- that --

9    that their becomes concern that based on Judge Gergel's

10   calendar, we're not gonna hear from him for many

11   months, or you know, you -- you -- there are certainly

12   cases in Federal court that -- that sometimes take over

13   a year to decide, and this is not meant in any way as

14   any -- any issue regarding Judge Gergel's calendar.

15             I have nothing -- I have to do with Judge

16   Gergel's calendar.  I have no -- don't know anything

17   about it.  But I don't want this case, which is active

18   before me, to be lingering about because another judge

19   in -- in South Carolina has a tremendous docket and

20   can't -- is -- is unable to issue the ruling -- a

21   particular ruling in this case.

22             That is not meant in any way as a disrespect

23   to Judge Gergel.  But it's my -- you know, this is a

24   case that I'm handling -- that I'm handling.  I've

25   decided to stay it for the reasons I've state --

Colloquy                                          62

1    stated.  But that's where we are.

2              So counsel, unless anyone else has -- has

3    anything to add, that will conclude these proceedings.

4    Does anyone have anything to say?  I take that as a no.

5              All of you have a wonderful weekend.  I thank

6    you so much.  And I do -- I want to again to ask coun

7    -- the lead counsel to pass on to the -- the people who

8    actually wrote some of these briefs, just to -- just to

9    pass on that I thought they were really outstanding.

10   So thank you so much and have a wonderful weekend.

11   Okay?

12             MS. BENNETT:  Thank you, Your Honor.

13             THE COURT:  Take care of yourselves.

14             MR. CALOGERO:  Thank you, Your Honor.

15             THE COURT:  Bye-bye.

16             (Proceeding concluded 2:51:41 p.m.)

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATION

 2

 3   I, KELLY A. ASHLAW, the assigned transcriber, do

 4   hereby certify the foregoing transcript of

 5   proceedings, time from 1:32:53 p.m. to 2:51:41 p.m.,

 6   is prepared in full compliance with the current

 7   Transcript Format for Judicial Proceedings and is a

 8   true and accurate non-compressed transcript of the

 9   proceedings as recorded.

10

11

12

13   _____

14

15   KELLY A. ASHLAW  AT 733
     G&L TRANSCRIPTION OF NJ        Date:  September 26, 2024
16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT C

**LOWENSTEIN SANDLER LLP**
Lynda A. Bennett, Esq. (Attorney #: 010251995)
lbennett@lowenstein.com
Eric Jesse, Esq. (Attorney #: 019372009)
ejesse@lowenstein.com
Craig Dashiell, Esq. (Attorney #: 062192013)
hweaver@lowenstein.com

One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500

*Attorneys for Plaintiff, BASF Corporation*

<table>
<tr><td>

BASF CORPORATION, as successor in interest to
CIBA CORPORATION,

               Plaintiff,

v.

ACE AMERICAN INSURANCE COMPANY, et al.

          Defendant.

</td><td>

**FILED**

**September 23, 2024**

Hon. Gary K. Wolinetz, J.S.C.

SUPERIOR COURT OF NEW JERSEY
MIDDLESEX COUNTY
LAW DIVISION

CBL Action

DOCKET NO.: L-1648-24

**ORDER**

</td></tr>
</table>

     **THIS MATTER** having been opened to the Court by Lowenstein Sandler LLP, counsel for Plaintiff BASF Corporation, as successor in interest to Ciba Corporation, ("BASF"), for an Order granting BASF's Motion to Stay this action; and the Court, having considered the papers submitted in support thereof, and in opposition thereto (if any), and the arguments of counsel; and for good cause shown,

     **IT IS** on this 23rd day of September, 2024,

     **ORDERED** as follows:

     1. This action, including, without limitation, BASF's obligation to effect service of the Complaint, Defendants' obligations to respond to BASF's Complaint, BASF's obligation to respond to Defendants' Counterclaims, and the parties' obligations to conduct discovery or otherwise engage in the litigation process, is **STAYED** up through and including January 10, 2025;

2. The parties are to appear for a case management conference on January 10, 2025, at a time to be provided to the parties by the Court. At such time, the parties are to report on the status of the actions captioned <u>BASF Corporation v. AIU Insurance Company</u>, No. No. 2:24-cv-00993 (D.S.C.) and <u>Certain Underwriters at Lloyd's London, and Certain London Market Insurance Companies v. BASF Corporation</u>, No. 2:24-cv-04325 (D.S.C.), pending before the Hon. Richard Gergel, U.S.D.J.

**FURTHER ORDERED**, that a copy of this Order shall be deemed served on all counsel of record upon its posting by the Court to the eCourts case jacket for this matter. Pursuant to <u>R.</u> 1:5-1(a), the Movant shall serve a copy of this Order on all parties not served electronically within seven (7) days of this Order.

*/s/ Gary K. Wolinetz*
**GARY K. WOLINETZ, J.S.C.**

( )  **Unopposed.**

(X)  **Opposed.**

**Pursuant to R. 1:6-2, the Court's Statement of Reasons has been set forth on the record.**